

**IT IS ORDERED as set forth below:**

**Date: August 23, 2022**

_Wendy L. Hagenau_

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 15-58440-WLH |
| | ) | |
| BAY CIRCLE PROPERTIES, LLC, *et al.,* | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE WENDY L. HAGENAU |
| | ) | |
| GOOD GATEWAY, LLC and, | ) | |
| SEG GATEWAY, LLC, on behalf of | ) | |
| JOHN LEWIS, CHAPTER 7 | ) | |
| TRUSTEE FOR BAY CIRCLE | ) | |
| PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 19-5284 |
| | ) | |
| NRCT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>ORDER AFTER TRIAL AND FINAL ORDER AWARDING ADEQUATE</u>**
**<u>PROTECTION TO SEG GATEWAY, LLC AND GOOD GATEWAY, LLC</u>**

## I.     Introductory statement

This adversary proceeding arises from the Court's order awarding an adequate protection lien to SEG Gateway, LLC and Good Gateway, LLC (collectively "Gateway") on the proceeds of this Debtor's Contribution Claim, when it sold property on which Gateway held a lien. The five Debtors[1] were liable to Wells Fargo as guarantors of a series of loans and the sale paid down the joint obligation to Wells Fargo. Ultimately, the debt to Wells Fargo was satisfied and all of the Debtors, except NRCT, paid a portion.  Bay Circle now seeks contribution from NRCT, the amount of which fixes the amount of the adequate protection lien. The Court's order on adequate protection for Gateway is not a final order,[2] awaiting the outcome of this adversary proceeding to determine the right of one Debtor against another for contribution. The Court notes that both the award of adequate protection and the determination of contribution are equitable remedies and require the exercise of discretion. The Court now enters its Order in this adversary proceeding and its Final Order on Adequate Protection for Gateway.

## II.    Findings of Fact

The Court makes the following findings of fact.[3] Additional findings of fact are discussed below in the context of the legal analysis. To understand the claims and defenses, one must start with the history of the entities and obligations involved.

---

[1] The five Debtors were Bay Circle Properties, LLC ("Bay Circle"), DCT Systems Group, LLC ("DCT"), Sugarloaf Centre, LLC ("Sugarloaf"), NRCT ("NRCT"), and Nilhan Developers, LLC ("Nilhan Developers") (collectively the "Debtors").

[2] The United States District Court for the Northern District of Georgia ("District Court") dismissed Debtors' appeal of the Court's order on adequate protection after concluding the order was not a final order because it did not grant final relief as it required a future determination of whether the replacement lien has actual value (Case No. 15-58440 Doc. No. 993).

[3] Pursuant to Fed. R. Evid. 201(b), the Court can take judicial notice of its own docket and the contents of documents filed in the case. Pursuant to a notice entered on April 20, 2022 (Doc. No. 159), the Court provided notice to the parties that it intended to take judicial notice of the docket of certain documents and evidence. The Court gave the parties ten days to file an objection. No objections were filed. Accordingly, the Court takes judicial notice of the docket of this adversary proceeding and the bankruptcy cases of Bay Circle (Case No. 15-58440), DCT (Case No. 15-58441), Sugarloaf (Case No. 15-58442), Nilhan Developers (Case No. 15-58443), and NRCT (Case No. 15-58444) maintained by the clerk of this Court and the content of all pleadings and other documents filed, the content of all orders entered,

### A.      Thakkar and Entities

Chittranjan ("Chuck") Thakkar ("Mr. Thakkar") has a background in accounting and business. He holds an MBA in finance, and he worked in commercial lending for banks in the Midwest for several years including as Vice President of Commercial Lending for Bank One. He then went into the manufacturing business and then the information technology business. In 2007-2008, he began investing in real estate. Mr. Thakkar set up various entities and related affiliates, several of which are described below, for which he served as manager. (The Court refers to any entity owned by Mr. Thakkar or his family and for which Mr. Thakkar was manager as a "Thakkar Entity".) At one time, there were over sixty Thakkar Entities; now there are twenty—twenty-five such entities.

Niloy, Inc. ("Niloy"), a Thakkar Entity, was originally in the information technology business and owned a retail computer store. Its focus eventually shifted to be a systems provider for corporate accounts. In its operations, it established a banking relationship with what ultimately became Wells Fargo (Niloy had been a customer of SouthTrust Bank since 1992, which was acquired by Wachovia and later Wells Fargo). Niloy stopped working in the IT industry sometime around 2013-14. Today, it does very little business.

Nilhan Financial, LLC ("NF") was formed in 2008 as a Thakkar Entity to act as a "banker" to the Thakkar Entities—it would loan funds borrowed by it or Niloy from Wells Fargo to other Thakkar Entities. Sometimes the proceeds were "loaned" to the Thakkar Entity documented by a note. Other times, the loan proceeds were "allocated" to another Thakkar Entity with simple

---

and all evidence and transcripts of hearings held before the Court during the pendency of the Chapter 11 cases and related adversary proceedings. At the trial, the Court also agreed to take judicial notice of the docket and content of pleadings of the bankruptcy case of Nilhan Financial, LLC in the U.S. Bankruptcy Court for the Middle District of Florida, Case No. 8:17-bk-03597-MGW. After the trial, both Plaintiff and Defendant requested the Court take judicial notice of statements found in court orders, pleadings, affidavits, and motions filed in other courts and other additional documents (Docs. Nos. 216, 227, & 228). The Court denied all requests to take judicial notice except as to Doc. No. 227 Exhibits A, C, D, E, F, and K (Doc. No. 246).

accounting entries. An involuntary bankruptcy petition was filed against NF in 2017, Case No. (8:17-bk-03597-MGW), in the U.S. Bankruptcy Court for the Middle District of Florida, and an order for relief was entered. The bankruptcy case remains pending as a Chapter 7 case.

Jax Fairfield Financial, LLC ("Jax Financial") was set up to finance investment in hotels. It financed or invested in some hotels, including one owned by Jax Fairfield Hotel Group, LLC, which is owned in part by another Thakkar Entity. When that hotel was sold in 2012, Jax Financial financed the purchase. The purchase money note was paid in 2014. Jax Financial later assumed some accounting functions from NF (tracking transactions between Thakkar Entities). It continued to transfer money to some of the Debtors in these cases post-petition, and Sugarloaf made payments on the SIMBA loan (discussed below) through Jax Financial in 2017 and 2018. Mr. Thakkar testified Jax Financial has no operating business of its own and has been winding down operations for the last three to four years.

Niloy & Rohan, LLC ("N&R") (named for Mr. Thakkar's sons, Niloy and Rohan) was set up to invest in companies. For the last four to five years, N&R has not operated. N&R was also an owner of Orlando Gateway Partners ("OGP") with SEG Gateway, LLC (SEG Gateway's members, in turn, were Good Gateway, LLC and Orlando Gateway).

OGP was formed to acquire and develop real property near the Orlando airport. State court litigation ensued between Gateway and OGP (Gateway alleged OGP improperly transferred property), and a judgment was entered against OGP in Florida. On April 20, 2015, OGP filed its own bankruptcy case (Case No. 6:15-bk-03448-MGW) in the United States Bankruptcy Court for the Middle District of Florida on the eve of a sheriff's sale of its real property.

The five Debtors were also Thakkar Entities.

Bay Circle was owned 50% by Mr. Thakkar and 50% by his wife, Saloni Thakkar ("Mrs. Thakkar") (Case No. 15-58440 Doc. No. 18 p. 5). Bay Circle was formed to hold real estate (6600 Bay Circle and 6610 Bay Circle ) previously owned by the Thakkars individually.

DCT was owned 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58441 Doc. No. 19 pp. 5-6). DCT was formerly involved in the IT industry, but it transitioned out of that business and came to own office warehouse facilities in Norcross, Georgia.

Nilhan Developers was owned 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58443 Doc. No. 18 p. 5). Nilhan Developers held several parcels of real property at 2800, 2810, 2812, and 2814 Spring Road, collectively known as the Emerson Property, located in Cobb County, Georgia.

Sugarloaf was owned 100% by Sugarloaf Centre Partners, LLC (Case No. 15-58442 Doc. No. 18 p. 5), which in turn is owned 50% by NRCT (one of the Debtors) and 50% by NCT Systems, Inc. ("NCT"). (Gateway claims 100% ownership of NCT by virtue of a judgment.) Sugarloaf owned unimproved land, a shopping center, and commercial buildings at 1930, 1950, and 1970 Satellite Boulevard, located in Gwinnett County, Georgia.

NRCT was owned 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58444 Doc. No. 18 p. 5). (Mr. Thakkar has subsequently claimed to own a 5% interest in NRCT.) NRCT held non-income producing real property in Georgia and South Carolina, 100% of an entity called Shops at New Hope, LLC, and 50% of Sugarloaf Centre Partners, LLC (which owns Sugarloaf).

### B.    Loan History

In 2008, Niloy had a line of credit with Wells Fargo in the amount of $50 million or more. On August 15, 2008, Wells Fargo entered into a new revolving line of credit with NF and Niloy as co-borrowers and direct obligors. The 2008 loan was amended on July 16, 2010. At that time, a

new loan agreement was executed. Niloy and NF remained liable for the amounts due under the original note. The loan was guaranteed by DCT, Sugarloaf, NRCT, Nilhan Developers, N&R, and Mr. and Mrs. Thakkar. Mr. and Mrs. Thakkar signed a note in the principal amount of $5,025,000 guaranteed by Niloy, NF, and DCT. DCT signed a note in the principal amount of $6,900,000 guaranteed by Niloy, NF, and Mr. and Mrs. Thakkar. (Bay Circle was not involved in the 2010 loan.)

Separately, Niloy and NF later entered into and were counterparties to interest rate swap transactions under a swap agreement dated January 6, 2009, which was amended on February 7, 2011 (the "Swap Agreement"). There were no other obligors on the Swap Agreement. Mr. and Mrs. Thakkar guaranteed the agreement.

The lending relationship between Wells Fargo and the Thakkar Entities was significantly restructured again on April 30, 2013 into two notes and the Swap Agreement: 1) a company note on which NF and Niloy were obligors (Company Loan Note) in the original principal amount of $19,750,000 and 2) an individual note (Individual Loan Note) on which Mr. and Mrs. Thakkar were obligors in the original principal amount of $12,910,000 (collectively, the "Loan Agreement"). The Individual Loan Note included the outstanding balance of the DCT loan and $2,575,000 of the company balance (which was then around $22 million). The Loan Agreement provides that the Company Loan Note and the Individual Loan Note amended, restated, and superseded the 2010 notes.

Each Debtor guaranteed all loan obligations (this was the first Bay Circle guaranty of any Wells Fargo debt and the first time Nilhan Developers, NRCT, and Sugarloaf guaranteed Mr. and Mrs. Thakkar's debt or the Swap Agreement. DCT was also added as a guarantor to the Swap Agreement.). The Company Loan was also guaranteed by Mr. and Mrs. Thakkar, N&R, OGP, and

6

Jax Financial. The Individual Loan was also guaranteed by Niloy, NF, N&R, OGP, and Jax Financial. (Obligations under the Company Loan Note, the Individual Loan Note, and the Swap Agreement are collectively referred to as the "Loan Obligations.") This is the first time Jax and OGP guaranteed the Loan Obligations.

The Loan Obligations were secured by collateral from the obligors and guarantors including five pieces of real property: 6600-6610 Bay Circle, Norcross (the "Bay Circle Property"), 2800-2814 Spring Road, Smyrna (the "Emerson Center Property," owned by Nilhan Developers), eight parcels of vacant land in Gwinnett County, Georgia (the "Sugar Hill Property," owned by NRCT), 1950 & 1970 Satellite Boulevard, Duluth, Georgia (the "Sugarloaf Property"), and 5100-5150 Peachtree Industrial Boulevard, Norcross, Georgia (the "Corners North Property," owned by DCT). The only other real estate collateral pledged was that of OGP, which was subsequently released in August 2013. The loans were also secured by agreements pledging ownership interests in various entities signed by Mr. Thakkar (pledging his membership interest in Niloy and Bay Circle), Mrs. Thakkar (pledging her membership interest in Niloy and Bay Circle), Rohan Thakkar (pledging his membership interest in NF, NRCT, Jax Financial, and Nilhan Developers), Niloy Thakkar (pledging his membership interest in OGP, N&R, and NCT Systems, Inc.), and Sugarloaf Center Partners (pledging its interest in Sugarloaf). The loan guarantees executed at this time also guaranteed the Swap Agreements. All loan obligations were cross defaulted and cross collateralized.

On August 9, 2013, the Loan Agreement was amended to release OGP as a guarantor, release OGP's property as collateral, and release the equity pledges of the owners of OGP (Niloy Thakkar through his ownership in N&R). OGP was then a party to litigation in Florida involving Good Gateway LLC and Good Capital Group, Inc., which constituted a default under the terms of

the Loan Agreement. Pursuant to section 1.5 of the amendment, all intercompany debt was subordinated to the Loan Obligations.

On October 3, 2014, Gateway obtained judgments in the amounts of $2.5 million and $12 million against Mr. Thakkar, OGP, N&R, NF, Niloy, and other non-Debtor entities in Florida state court. Gateway recorded its *fieri facias* including in Gwinnett County, Georgia on December 26, 2014. At the time, Mr. and Mrs. Thakkar jointly owned the property now referred to as the Bay Circle Property, resulting in Gateway's lien on the Bay Circle Property.

On April 3, 2015, Wells Fargo sent notice to all of its obligors, including Mr. Thakkar, accelerating the maturity of all amounts due and providing notice of its intent to foreclose on real property on or after May 15, 2015. On May 1, 2015, Mr. and Mrs. Thakkar conveyed the Bay Circle Property to Bay Circle, but subject to Gateway's lien and the Wells Fargo security deed.

### C.     Bankruptcy Filings

On May 4, 2015, the Debtors each filed a petition for relief under Chapter 11 of the Bankruptcy Code. On June 8, 2015, the Court administratively consolidated the Debtors' cases.

Almost immediately, on May 15, 2015, Wells Fargo filed a motion for appointment of a chapter 11 trustee for all of the Debtors (Case No. 15-58440 Doc. No. 12). The Court denied the request to appoint a trustee but found grounds existed to appoint an examiner under 11 U.S.C. § 1104(c). On July 16, 2015, the Court entered an order appointing Jessica Talley-Peterson as examiner (Case No. 15-58440 Doc. No. 137), and authorized her to supervise and oversee the collection of all monies, rents, and accounts receivable by the Debtors and the payment of all expenses by the Debtors; supervise and oversee the accounting in the Debtors' books and records; oversee the preparation of budgets and reports, including monthly operating reports; investigate the collection of funds, the payment of expenses, and the recording of transactions in the Debtors'

books from January 1, 2015 forward; and discuss the process of  reconciliation of the inter-company accounts for 2014 and 2015 and review the final reconciliation. The Examiner filed reports on August 14, 2015 and November 20, 2015 (Case No. 15-58440 Docs. Nos. 157 & 274), as well as other reports on specific topics. Her appointment was terminated, effective November 30, 2016 (Case No. 15-58440 Doc. No. 520).

### 1.     Adequate Protection Payments to Wells Fargo

On May 29, 2015, the Debtors filed a motion for authority to use cash collateral on an interim and final basis. (NRCT asserted it owned raw land and did not request authorization to use cash collateral.) The Court authorized the interim use of cash collateral (Case No. 15-58440 Docs. Nos. 44, 138, 155), and later approved the use of cash collateral on a final basis (Case No. 15-58440 Doc. No. 242, as amended at Docs. Nos. 410, 421, 546, 592). As partial adequate protection for Debtors' use of cash collateral, the Debtors were directed to make adequate protection payments on the 25th of each month from their monthly income (less expenses and escrowed funds).

### 2.     Proof of Claim

On November 18, 2015, Wells Fargo filed proof of claim no. 6, asserting a secured claim against each Debtor in the amount of $22,075,444.85 based on the amount due under the Loan Agreement and on the Loan Obligations.

### 3.     Settlement Agreement

On November 30, 2015, the Debtors sought approval of a Settlement Agreement between Wells Fargo, the Debtors, and other non-Debtor entities (Niloy; NF; Mr. and Mrs. Thakkar; N&R; Jax Financial; Niloy Thakkar; Rohan Thakkar; and Sugarloaf Centre Partners) (the "Settlement Agreement"). Niloy Thakkar, Rohan Thakkar, and Sugarloaf Centre Partners were identified as

"Pledgors." In the agreement, Wells Fargo agreed to forbear from enforcing obligations and performance owed by the Debtors and other loan parties. The Settlement Agreement was amended on January 8, 2016 and approved by the Court on January 13, 2016 (Case No. 15-58440 Doc. No. 302).

The Settlement Agreement stipulated the total debt due to Wells Fargo was $22,561,967.14, as of August 31, 2015, and required the full amount plus accruing interest and fees to be paid by April 30, 2017. It set various deadlines for interim payments and release prices for seven properties owned by the Debtors (including the Bay Circle Property) that secured its lien. No properties other than property of the Debtors was intended to be sold. In the event Wells Fargo was not paid in full, it could foreclose through the typical, non-judicial foreclosure process in Georgia or by recording deeds-in-lieu of foreclosure of the Debtors' properties without further hearing and crediting the outstanding debt in the amount of the agreed-upon release prices. The deeds in lieu were transferred to Wells Fargo to hold in escrow. The Settlement Agreement required a pay down of principal and reimbursement of fees by payments in January and February 2016, totaling $201,086.78.

After the Settlement Agreement was finalized and approved, Bay Point acquired the loans from Wells Fargo, and Wells Fargo assigned its interest in the properties and the deeds in lieu of foreclosure to Bay Point pursuant to a loan purchase and sale agreement dated March 24, 2016.

### 4.    Property Sales

The Debtors proceeded to make adequate protection payments to Wells Fargo/Bay Point and sold and/or refinanced various properties to pay off the Wells Fargo/Bay Point debt, as contemplated by the Settlement Agreement.

On October 28, 2016, the Court granted Sugarloaf's motion seeking approval of a post-petition loan in the amount of $7,500,000 from SIMBA Global (Case No. 15-58440 Docs. Nos. 434, 454) secured by the Sugarloaf Property with the proceeds to be paid to Bay Point. The loan was consummated, and $7.5 million was paid to Bay Point.

A milestone payment of $5.5 million was due on January 31, 2017. On January 12, 2017, Nilhan Developers filed a motion to obtain post-petition financing (Case No. 15-58440 Doc. No. 550) from SIMBA Global in the amount of $5.5 million secured by the Emerson Center Property to make the milestone payment. The financing was approved on January 25, 2017 (Case No. 15-58440 Doc. No. 557), but the loan did not close.

Instead, on January 30, 2017, Bay Circle filed an emergency motion seeking approval of the sale of the Bay Circle Property for $5 million (Case No. 15-58440 Doc. No. 567). Gateway objected arguing that its judgment lien on half of the Bay Circle Property would be unnecessarily lost and asked that other Debtors be required to marshal and sell other properties first before selling the Bay Circle Property. The Court overruled the objections and approved the sale on February 14, 2017 (subject to Gateway's right to an adequate protection claim), provided that Bay Point was entitled to credit bid (Case No. 15-58440 Doc. No. 591). After an auction conducted by the U.S. Trustee, Bay Point was the successful bidder with a $5.35 million credit bid, credited to the Bay Point debt.

On April 11, 2017, Nilhan Developers filed a motion seeking approval of a sale of the Emerson Center Property to Westplan Investors Partners, L.P. ("Westplan") (for $7.2 million Case No. 15-58440 Doc. No. 634). The Court granted the motion on April 28, 2017 (Case No. 15-58440 Doc. No. 679). As a condition of sale, Mr. Thakkar or a non-debtor party on his behalf was ordered

to pay an additional $100,000 to Bay Point for a total payment of $7.3 million to Bay Point. The sale closed on May 1, 2017.[4]

Despite the sales and refinancing, the Bay Point debt was not paid in full by April 30, 2017. Bay Point filed a notice of default on May 2, 2017 stating that it intended to record the deed in lieu of foreclosure on the Corners North Property owned by DCT pursuant to the terms of the Settlement Agreement (Case No. 15-58440 Doc. No. 685). On May 9, 2017, Bay Point recorded the deed in lieu of foreclosure as to the Corners North Property and advertised the property for a foreclosure sale. On September 5, 2017, Bay Point conducted a foreclosure sale of the Corners North Property and credit bid $2,825,000. Bay Point recorded the deed under power of sale that same day.

On August 25, 2017, Mr. Thakkar filed a complaint against Bay Point in Fulton County Superior Court related to the DCT foreclosure, alleging breach of a duty of good faith, civil conspiracy, promissory estoppel, fraudulent or negligent representations, and wrongful foreclosure, and seeking to set aside the foreclosure and recover attorney's fees, prejudgment interest, and punitive damages. Mr. Thakkar amended his complaint to add DCT as a plaintiff. Bay Point removed the action to the bankruptcy court, which granted Bay Point's motion for judgment on the pleadings on January 12, 2018 (Adv. Proc. 17-5248 Doc. No. 8). Mr. Thakkar and DCT appealed the order to the District Court, which affirmed the Court's order granting Bay Point judgment on the pleadings. Mr. Thakkar and DCT appealed to the Eleventh Circuit Court of Appeals. In the meantime, Bay Point asserted it had indemnification claims under the Loan Agreement against all obligors and guarantors for the legal fees and costs it was incurring. The Chapter 11 Trustee (who had been appointed in the interim, as discussed below) and Bay Point

---

[4] Westplan then assigned its rights under the agreement to Accent Cumberland Apartments, LP.

entered into a settlement agreement, pursuant to which the appeal would be dismissed. Bay Point agreed to deliver the unrecorded deeds in lieu of foreclosure on NRCT's property to the Trustee, to not pursue further indemnification claims, and to release its claims against the Trustee, the Debtors, and their estates (Case No. 15-58440 Doc. No. 1029). The Court approved the settlement agreement, as amended (Case No. 15-58440 Doc. No. 1087), on June 10, 2019 (Case No. 15-58440 Doc. No. 1089). So, finally, on June 10, 2019, the Bay Point loan was satisfied.

### 5.    Gateway Adequate Protection Lien

When the Court authorized the sale of the Bay Circle Property, the Court gave Gateway additional time to make its claim for equitable relief. Gateway filed a Motion for Relief Under 11 U.S.C. § 363 and the Doctrine of Marshaling (Case No. 15-58440 Doc. No. 624) on March 24, 2017. Gateway sought adequate protection of its lost judgment lien, arguing the sale terminated Gateway's only lien against the Debtors' property. Gateway amended the motion to request substantive consolidation of all the Debtors (Case No. 15-58440 Doc. No. 740). The Court held an evidentiary hearing on Gateway's requests on October 10, 2017, after which Gateway withdrew its request for substantive consolidation.

On November 7, 2017, the Court denied the request for marshaling and granted Gateway's request for adequate protection of the lien it lost by virtue of the sale of the Bay Circle Property (Case No. 15-58440 Doc. No. 797) (the "AP Order"). The Court explained adequate protection under the Bankruptcy Code is a flexible concept, and it ordered that Gateway would hold a replacement lien on Bay Circle's claims for contribution and subrogation up to the amount of $2,675,000 (half the sale price of the Bay Circle Property, representing Gateway's lien on only Mr. Thakkar's half interest in the property) ("Contribution Claim"). The AP Order is incorporated herein.

The Debtors appealed the AP Order. On March 7, 2019, the District Court entered an order dismissing Debtors' appeal of the AP Order for lack of jurisdiction, concluding that the AP Order did not grant final relief on the issue because it required a future determination of whether the replacement lien had actual value and, therefore, was not a final order (Case No. 15-58440 Doc. No. 993).

When the Trustee was appointed, the Trustee was tasked with, inter alia, investigating the potential Contribution Claim of Bay Circle against NRCT and any other Debtors or entities. The Trustee asked GlassRatner Advisory & Capital Group, LLC ("GlassRatner") to use its expertise and analyze possible claims by Bay Circle against the other Debtors and non-Debtors, taking into account payments made by the different Debtors and other obligors. On March 27, 2019, the Trustee filed his Preliminary Analysis Regarding Bay Circle's Contribution Claim (Case No. 15-58440 Doc. No. 1007) ("Preliminary Report") with a chart prepared by Paul Dopp of GlassRatner showing the payments made by the Debtors to Wells Fargo and Bay Point. The Trustee acknowledged that additional information was needed to complete the analysis. Mr. Dopp continued his analysis and produced a report suggesting possible claims by Bay Circle based on various assumptions (the "Dopp Report"). The Dopp Report set forth two possibilities, Scenario 1 and Scenario 2, and concluded Bay Circle held a claim in the range of $0 to $2,675,000. (Case No. 15-58440 Doc. No. 1030 Ex. 1.)

On April 29, 2019, the Trustee filed a Motion Requesting Determination of the Amount of Debtor Bay Circle's Contribution Claim (Case No. 15-58440 Doc. No. 1030), attaching the Dopp Report ("Motion to Determine Claim"). The Trustee requested the Court enter an order holding Bay Circle has a contribution claim against NRCT and each of the non-Debtor obligors in the amount of $2,675,000, the maximum adequate protection claim provided to Gateway. Mr. and

14

Mrs. Thakkar, Niloy and Rohan Thakkar, and Gateway all filed responses (Case No. 15-58440 Docs. Nos. 1066, 1067, & 1068). The Thakkars objected to the procedural posture of the motion and argued it was not appropriate for the Trustee to pursue a claim on behalf of Bay Circle against NRCT since he served as Trustee of both. Gateway argued in support of the Motion to Determine Claim and in favor of Scenario 2, calculating Bay Circle's Contribution Claim using all co-obligors, not just the Debtors.

After a hearing on May 30, 2019, the Court entered a Scheduling Order (Case No. 15-58440 Doc. No. 1080), which, among other things, instructed parties-in-interest to submit papers about whether the Court should modify its AP Order and directed the Trustee to file a motion for approval of any arrangement whereby Gateway may prosecute the Contribution Claim of Bay Circle. In its Scheduling Order, the Court also ordered the non-Debtor obligors to file a statement "as to whether they insist on being named as parties in . . . litigation." Mr. and Mrs. Thakkar filed a response (Case No. 15-58440 Doc. No. 1165) stating that while they did not consent to jurisdiction, they "do not insist on being named as parties in any adversary proceeding." Similarly, Niloy and Rohan Thakkar filed a statement (Case No. 15-58440 Doc. No. 1166) stating they were not waving any objection to jurisdiction, but "they do not insist on being named parties to any adversary proceeding."

The Court modified the AP Order (Case No. 15-58440 Doc. No. 1125). The Court clarified, first, that it did not make a final determination in the AP Order as to whether Bay Circle has a contribution or subrogation claim against any specific party and if so in what amount. Rather, the AP Order simply awarded Gateway a replacement lien on any contribution or subrogation claim which Bay Circle may have. Second, the Court revised the AP Order to provide that the adequate protection lien granted to Gateway was on the net proceeds of Bay Circle's claims for subrogation

or contribution, and not on the claims themselves. Finally, the Court clarified the adequate protection replacement lien granted to Gateway is only on the net proceeds of Bay Circle's claims against the other Debtors. The Court explained the settlement agreement was negotiated after the filing of the bankruptcy cases and was approved by the Bankruptcy Court. The AP Order arose in the context of the bankruptcy cases and the complaint about the sale was that all of the Debtors' property was liable to the secured lender, yet not all of the Debtors' property was being used to satisfy that lien. Thus, limiting the lien to proceeds from claims against the Debtors only was appropriate.

On May 4, 2021, the Court further modified that AP Order to provide that the adequate protection lien granted to Gateway is on the net proceeds of any contribution or subrogation claim which Bay Circle may have against the other Debtors in the cases pending before this Court, with such claim being net of all allowed Chapter 11 and Chapter 7 administrative expenses and costs (Case No. 15-58440 Doc. No. 1490).

On June 20, 2019, the Trustee filed a Motion for Order Regarding Standing to Pursue Contribution and/or Subrogation Claims of Bay Circle (Case No. 15-58440 Doc. No. 1093). The Trustee indicated he did not think it was appropriate for him to participate in the litigation and the real parties in interest should prosecute and defend the action. The Court approved the motion and granted Gateway standing to pursue the Contribution Claim of Bay Circle on July 11, 2019 on behalf of Bay Circle (Case No. 15-58440 Doc. No. 1137). Equity was allowed to defend on behalf of NRCT.

### 6.      Status of Bankruptcy Cases

On December 11, 2018, the Court appointed a Chapter 11 Trustee in all five bankruptcy cases (Case No. 15-58440 Doc. No. 919). The appointment was triggered by Mr. Thakkar's actions in the Nilhan Developers case.[5] The Debtors ultimately pursued different paths to resolution.

#### a)      *Bay Circle*

The Chapter 11 Trustee filed a Motion to Convert the case to one under Chapter 7 (Case No. 15-58440 Doc.  No. 1371) on April 8, 2020, contending Bay Circle's only remaining asset was the Contribution Claim it held against the other Debtors. The Court granted the motion to convert to Chapter 7 and severed the case from the other cases (Case No. 15-58440 Doc. No. 1420). John Lewis was appointed Chapter 7 Trustee.

#### b)      *DCT*

Mr. Thakkar filed a motion to dismiss the case (Case No. 15-58440 Doc. No. 1364) on March 31, 2020, which was granted on May 1, 2020 (Case No. 15-58440 Doc. No. 1417).

#### c)      *Sugarloaf*

On August 14, 2020, the Trustee and Westmoore Lending Partners IV, LLC ("Westmoore") (the successor secured lender to SIMBA) reached a settlement whereby the stay was lifted for the secured lender to foreclose on the Sugarloaf Property and the secured lender would be entitled to all cash on hand remaining in the case after other claims are paid in full (Case No. 15-58442 Doc. No. 152). The Trustee then filed a motion to dismiss the case (Case No. 15-58442 Doc. No. 147), which the Court granted on August 28, 2020 (Case No. 15-58442 Doc. No. 164), contingent on the resolution of the Trustee's and his professionals' fees. Fee applications for

---

[5]After learning Nilhan Developers exercised a buyback option and repurchased the Emerson Center Property without Court approval, the Court entered an order approving the appointment of Ronald Glass as Chapter 11 Trustee on December 11, 2018 (Case No. 15-58440 Doc. No. 922).

the Trustee and related professionals were approved by the Court, but the orders were appealed and ultimately dismissed by the appellate courts. The Court has now entered final orders on all professional fees and an order for final disbursements. After such disbursements, the case will be dismissed.

### d)    *Nilhan Developers*

On August 20, 2018, Nilhan Developers exercised a buyback option and repurchased the Emerson Center Property from the assignee of Westplan (Accent) for $9,269,212.32, using funds obtained from loans by Rass Associates, LLC and Norcross Hospitality, LLC to Nilhan Developers. The purchase and financing were not disclosed to or approved by the Court. After the Court appointed a Trustee, the Trustee sold the property to a third party on August 15, 2019. Rass' claim for the loan it made was resolved. Norcross Hospitality filed a claim for an administrative expense based on the funds it advanced to Nilhan Developers to reacquire the property. The Court denied the application for administrative expense claim and directed that Norcross Hospitality's principal claim of $5,169,212.32 be paid to the extent funds were available after all creditors (including NF) were paid (Case No. 15-58443 Doc. No. 158) (the "Norcross Claim Resolution Order"). The Norcross Claim Resolution Order was recently affirmed by the Eleventh Circuit Court of Appeals.

Nilhan Developers scheduled a debt to NF for $9.5 million. After a contested evidentiary hearing, the Court allowed NF a claim in the amount of $9,500,000 less the amount paid on the Wells Fargo debt on account of the sale of the Emerson Center Property (Case No. 15-58440 Doc. No. 1365).[6]

---

[6] The claims of NF in the amount of $83,672 and $15,434.07, to which no objections were made, were also allowed.

The Chapter 11 Trustee filed a plan, which was ultimately confirmed (Case No. 15-58443 Doc. No. 225). Now that the Norcross Claim Resolution Order has been affirmed, a final distribution is forthcoming and should result in payment in full of NF's claim.

### e) NRCT

The Chapter 11 Trustee's Fourth Amended Plan was confirmed on July 16, 2020 (Case No. 15-58444 Doc. No. 132).[7] The only outstanding issue is the resolution of this adversary proceeding and the entry of a final order on Gateway's adequate protection lien. The Court entered an Order Establishing Contribution Fund and Proceeding for Final Fees (Case No. 15-58444 15-58444 Doc. No. 323) on February 11, 2022, pursuant to which the Plan Agent deposited $2,104,129.27 into the Court Registry (Case No. 15-58444 Doc. No. 327). The Court entered a final decree on April 1, 2022 (Case No. 15-58444 Doc. No. 331). The Court has entered several orders releasing funds from the registry. The principal balance in the Court Registry as of trial is $2,660,765.00.

### D. Adversary Proceeding

On behalf of Bay Circle, Gateway filed a complaint against NRCT on August 13, 2019 asserting Bay Circle's Contribution Claim.[8] Defendant answered the Complaint on May 11, 2020 (Doc. No. 11), asserting nine affirmative defenses including the insolvency of NRCT. The parties

---

[7] After plans were confirmed in the Nilhan Developers and NRCT cases, motions were filed to remove Mr. Glass as Trustee, disqualify his firm as financial advisor, and disgorge the Trustee's and his firm's fees (Case No. 15-58443 Doc. No. 238 & Case No. 15-58444 Doc. No. 178). Unbeknown to the Court, Mr. Glass's professional partner was engaged by Gateway to serve as an officer and director of NCT when Mr. Glass was appointed as Trustee. The Court found Mr. Glass and his firm failed to adequately disclose the connections. The Court removed Mr. Glass as Plan Agent in both the NRCT and Nilhan Developers cases (Case No. 15-58443 Doc. No. 300 & Case No. 15-58444 Doc. No. 230), and replacement plan agents were appointed.

[8] When the Bay Circle case was converted to Chapter 7 on May 5, 2020 (Case No. 15-58440 Doc. No. 1420), John Lewis, Jr. was appointed as Chapter 7 Trustee (Case No. 15-58440 Doc. No. 1425), and he filed a notice of substitution in place of the Chapter 11 Trustee in the adversary proceeding (Case No. 15-58440 Doc. No. 1454).

extended the discovery deadlines and related time periods through a series of eight consent motions and orders.

On November 19, 2021, Defendant NRCT filed a Motion for Summary Judgment (Doc. No. 76). Defendant contended it was entitled to judgment as a matter of law because Scenario 1 of the Dopp Report indicated Plaintiff had no claim. Defendant accepted as "undisputed" the conclusion in Scenario 1. Defendant discounted Scenario 2 entirely and argued Plaintiff had no evidence the co-obligors were solvent. Plaintiff Bay Circle/Gateway opposed summary judgment, arguing Scenario 2 was viable and insolvency is an affirmative defense, so Defendant had the burden of proving it.

After reviewing the briefs, the Court denied summary judgment (Doc. No. 104). The Court stated that Plaintiff, as the party seeking contribution, has the burden of proving by a preponderance of the evidence that it is entitled to contribution and, while there is a presumption all co-obligors are solvent, Defendant is entitled to offer proof to overcome that presumption. The Court explained the time of determining insolvency is the time of trial. Id. (citing Jewett v. Maytham, 118 N.Y.S. 635, 641 (Sup. Ct. 1909); Harris v. Handmacher, 542 N.E.2d 77, 81 (Ill App. 1989)). The Court's Order on Summary Judgment (Doc. No. 104) is incorporated herein.

After many delays, changes of counsel, and numerous discovery disputes, the Court held a trial on the Complaint on May 9-11, 2022. The parties submitted post-trial briefs (Docs. Nos. 230, 231 & 235), responsive briefs (Docs. Nos. 236 & 237), and additional evidence, most of which was excluded (Docs. Nos. 246 & 256). Defendant also sought reconsideration of the Court's evidentiary ruling to exclude several of its exhibits, which the Court denied (Doc. No. 256). Finally, the Court heard closing arguments from the parties on July 12, 2022.

### III.   Jurisdiction

Bankruptcy court jurisdiction is codified in 28 U.S.C. § 1334(b) and 28 U.S.C. § 157. Pursuant to 28 U.S.C. § 1334, "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). "The bankruptcy court's jurisdiction is derivative of and dependent upon these . . . bases." Cont'l Nat'l Bank of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1344 (11th Cir. 1999) (citing Celotex Corp. v. Edwards, 514 U.S. 300 (1995)).

The first category of cases, "arising under" proceedings, "are matters invoking a substantive right created by the Bankruptcy Code." Id. at 1345. Such matters are considered core proceedings. Id. at 1348 (citing Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987)). The second category, "arising in a case under title 11," involves administrative-type matters or matters that could arise only in bankruptcy, such as filing a proof of claim or an objection to the discharge of a particular debt. See id. at 1345; see also 28 U.S.C. § 157(b)(2). The definition covers claims that "are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy." Baker v. Simpson, 613 F.3d 346, 350-51 (2d Cir. 2010) (quoting In re Wood, 825 F.2d at 97). These matters also typically constitute core proceedings. Alternatively, a "proceeding [that] does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy" but is related to the bankruptcy case, is also within the Court's jurisdiction but is not a core proceeding. Toledo, 170 F.3d at 1348 (quoting Wood, 825 F.2d at 97); 28 U.S.C. § 157(c)(1).

This adversary proceeding arises in both the Bay Circle and NRCT cases and arises under the Bankruptcy Code. It addresses the liability of one Debtor to another arising from the sale of property in bankruptcy and the satisfaction of common claims in bankruptcy. Such matters are

particular to and uniquely affected by these bankruptcy cases. See Delaware Tr. Co. v. Wilmington Tr., N.A., 534 B.R. 500, 515–16 (S.D.N.Y. 2015) (dispute that "directly bears on the distribution of the Debtors' current property, . . . 'concern[s] the administration of the estate' by the Bankruptcy Court, which in turn is a core bankruptcy function under 28 U.S.C. § 157(b)(2)(A)."(citation omitted)); In re Allnutt, 220 B.R. 871, 885 (Bankr. D. Md. 1998) ("Because the plaintiff would have no cause of action except for the bankruptcy sale, the present suit is one 'arising in' the jurisdiction of the bankruptcy court.").

The Complaint also seeks to determine the amount of an adequate protection lien crafted by the Court under section 361. The concept of adequate protection derives from the Bankruptcy Code and could only take place in a bankruptcy case. See 11 U.S.C. § 361; In re Markos Gurnee P'ship, 252 B.R. 712, 713 (Bankr.N.D.Ill.1997), aff'd sub nom. First Midwest Bank v. Steege, 1998 WL 295507 (N.D. Ill. May 21, 1998) ("Adequate protection is a concept created by the Bankruptcy Code . . ., and hence the present proceeding, which seeks to enforce an order for adequate protection could only take place in a bankruptcy case. Such proceedings 'arise in' cases under Title 11, and therefore are within the jurisdiction of the district court pursuant to 28 U.S.C. § 1332(b)."). This proceeding thus involves matters arising under the Bankruptcy Code and in bankruptcy cases (both Bay Circle and NRCT) under Title 11.

The Court, therefore, has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and it is a core matter under 28 U.S.C. § 157(b)(2)(A), (B), (M), (N), & (O). Moreover, the parties agreed in the Consolidated Pre-Trial Order there is no dispute as to the Court's jurisdiction (Doc. No. 151).[9]

---

[9] One of the issues at trial was the extent to which the Court should consider the non-Debtor obligors in determining the "denominator" for contribution. Defendant's counsel attempted to raise questions about the Court's jurisdiction over non-parties to the adversary proceeding and, particularly, over the non-Debtor obligors. However, the Court has not and is not determining the liability of any party other than NRCT.

## IV.    Legal Analysis

In this contribution action, the parties have focused on three primary arguments: the number of guarantors/obligors to be used in the denominator; the time period of payments over which the contribution claim relates; and the effect of insolvency on the calculation.

The Court concludes the number of guarantors/obligors to be used in the denominator is five. This is consistent with the relief requested by Gateway and the Court's award of an adequate protection lien. It also recognizes that the primary obligors (Niloy, NF, and Mr. and Mrs. Thakkar) are liable to a guarantor for the full amount paid, not just a "fair share." Moreover, the pledgors did not have general liability to Wells Fargo; their liability to Wells Fargo was only to the extent of the equity interests pledged. No evidence of the present value of any such interests was presented, so no basis exists for concluding Bay Circle has a claim against the pledgors.

The Court also concludes that the time period for the payments is post-petition. This analysis is consistent with the Court's award of an adequate protection lien and the bankruptcy proceedings, but it also recognizes that the payments made by the primary obligors (Niloy, NF, and Mr. and Mrs. Thakkar) are not to be redistributed to the guarantors and thus are not counted in calculating the contribution claim of one guarantor against another. Using the post-petition payments also recognizes that a contribution claim does not arise until the guarantor has made a payment and the obligation has been paid in full. Both of these events occurred post-petition, so the contribution claim arose post-petition.

Finally, solvency plays a role in calculating the contribution claim. The Court concludes NRCT is solvent for purposes of this calculation, DCT is insolvent for purposes of the calculation, and the solvency of the remaining three debtors is not relevant to the calculation. If relevant, the Court concludes the presumption of solvency has been rebutted as to N&R, but not as to Jax

23

Financial. The solvency of the primary obligors is not relevant but, if it was, the presumption of solvency has been rebutted as to Mr. Thakkar. Plaintiff has not established his solvency. The presumption of solvency of Ms. Thakkar and Niloy has <u>not</u> been rebutted. Solvency of NF has been established up to $800,000.

The Court concludes that Bay Circle holds a contribution claim against NRCT in the amount of $332,648.74.

### A.    Contribution

Under Georgia law, a joint obligor who has paid more than his share of a joint debt is entitled to contribution from the other obligor and may pursue legal and equitable actions to enforce his contribution rights. O.C.G.A. § 23–2–71. The right of action for contribution is equitable in origin. <u>See</u> <u>Dent v. King</u>, 1 Ga. 200, 200-01 (1846) ("a claim or demand, by one surety against another, for contribution, is a claim or demand purely of equitable origin; and whether sought to be enforced by an action at law, or bill in equity, its character is the same"); <u>Fender v. Fender</u>, 30 Ga. App. 319, 117 S.E. 676 (1923) (explaining the concept "has its origin in a sense of natural justice"). When the relevant parties are "sureties for the same principal for the same sum of money . . . and one pays more than an equal share of the sum, he may compel contribution from his cosureties." O.C.G.A. § 10–7–50. As the Georgia Court of Appeals has explained, "*[t]o the creditor* both parties are equally bound, and if one pays more than his equal share he may seek contribution from the other." <u>Steele v. Grot</u>, 232 Ga. App. 847, 848 (1998) (emphasis in original). "The right of contribution arises not when the joint obligation is made but when one obligor pays more than his share of the liability." <u>Id.</u>

In general, "all co-obligors must contribute equally in discharging their common obligation." 18 Am. Jur. 2d Contribution § 20. "Where a party is entitled to contribution, the

general rule is that the measure of recovery should be the amount the claimant has paid in excess of his or her proportionate share." 18 Am. Jur. 2d Contribution §§ 17, 20; see also Sound Built Homes, Inc. v. Windermere Real Estate/S., Inc., 118 Wash. App. 617, 634 (2003), as amended on denial of reconsideration (Oct. 7, 2003) ("[T]he one who seeks contribution 'may recover . . . only the excess which he has paid over his share.'" (citation omitted)).

Contribution is a legal right and an equitable right. Legally, insolvency is irrelevant. "At common law[,] contribution could be enforced only for the aliquot share of each, reckoned as if all were solvent[.]" Higdon v. Bell, 25 Ga. App. 54 (1920). The equitable rule of contribution adjusts contribution requirements for insolvency: "[t]he rule in equity in case of such insolvency is that the solvent sureties bear equally the burden of payment." Todd v. Windsor, 118 Ga. App. 805, 808 (1968); see also Crawford v. Patrick Hosp. Inv'rs, LLC (In re PCH Operations, LLC), 2016 Bankr. LEXIS 4163, at *47 n.25 (Bankr. W.D.N.C. Dec. 6, 2016) ("If the basis for cosurety contribution is equity, insolvent sureties are not accounted for in determining the per capita share, meaning the subsequent insolvency of a cosurety increases the exposure of solvent cosureties."); Cooper v. Greenberg, 191 Va. 495, 503 (1950) ("Contribution in a court of equity proceeds upon the application of the fundamental rule that equality is equity, and that if one of the sureties is insolvent or beyond jurisdiction, the loss will be apportioned among the solvent and available sureties."). Therefore, in equity, contribution is based on the number of available co-guarantors and excludes those who are insolvent. See Kroona v. Dunbar, 868 N.W.2d 728, 736 (Minn. Ct. App. 2015). The courts view it as "inequitable" for the complaining party to be restricted from recovering fully from the solvent parties or for the solvent parties to escape a full share of liability. In re Wetzler, 192 B.R. 109, 118 (Bankr. D. Md.), aff'd sub nom. Wetzler v. Cantor, 202 B.R. 573 (D. Md. 1996); Restatement (First) of Security § 154, Comment h. The equitable objective is and

has always been to equalize the loss among those who are equally bound. 192 B.R. at 118. Georgia has codified this approach. "If one of the cosureties is insolvent, the deficiency in his share must be borne equally by the solvent sureties." O.C.G.A. § 10-7-50; see Higdon, 25 Ga. App. 54.

### B.    Denominator

Plaintiff argues that the contribution claim should be calculated with reference to the Debtors and non-Debtor obligors, including all eleven obligors plus the three pledgors. The Chapter 11 Trustee recommended a division by eleven. Mr. Dopp calculated the claim by both five and eleven, at the direction of the Chapter 11 Trustee, but he took no position on which was correct.[10] Defendant contends the calculation should be limited to how much each of the five Debtors paid or should have paid. It argues the Court has already determined only the Debtors should be considered. The Court has reviewed its prior orders. The first order reflects the initial thought that contribution may be determined by reference to only the five Debtors. But that initial order was not final, and the Court amended it to provide that the adequate protection lien was only on the claims against the Debtors. The order did not, however, decide how to calculate the claims against the Debtors. This issue was left for determination during the litigation process. Having considered the arguments of the parties, the Court now concludes that the contribution claim should be divided among only the five Debtors.

First, the context of this claim is critical. The contribution claim is being determined for purposes of setting or liquidating an adequate protection claim. Gateway had a claim to protect

---

[10] Defendant argued strenuously that Mr. Dopp's opinion was not entitled to weight because of the conflict held by GR at the time the report was prepared which resulted in GR and Mr. Glass being removed as Trustee and professional in the NRCT case. Mr. Dopp did not opine on the number of obligors. He prepared his report based on instructions from his counsel. The Court views the question of how to divide the contribution claim as a legal one and does not rely on any opinion by Mr. Dopp or the Trustee's initial position in this case. Instead, the Court's decision is based on the arguments of the parties to this adversary proceeding and its own judgment.

because bankruptcy law defines claim broadly,[11] and the Supreme Court in <u>Johnson v. Home State</u>
<u>Bank</u>, 501 U.S. 78 (1991), has held that the holder of a non-recourse lien (like Gateway) is a holder
of a claim. Gateway's adequate protection claim arises only in a bankruptcy proceeding. Here, it
arose because Gateway objected to the sale of the Bay Circle Property and argued the other Debtors
should have been required to sell their property first. Its arguments were focused on the five
Debtors. Likewise, in its Motion for Relief Under 11 U.S.C. § 363 and the Doctrine of Marshaling
(Case No. 15-58440 Doc. No. 624), Gateway sought adequate protection in the form of a
replacement lien on the assets of the Debtors. Gateway argued the sale of the Bay Circle Property
had the effect of terminating Gateway's only lien against property of the Debtors. Gateway argued
the assets of the five Debtors should be marshaled to do equity to creditors. Gateway's focus was,
therefore, only on the shared responsibility of the five Debtors, not the other obligors.

Further, the bankruptcy cases were filed to protect the Debtors' properties. The Settlement
Agreement was negotiated during the bankruptcy cases and approved by the Bankruptcy Court. It
provided the "way forward" in the cases. While all obligors, guarantors, and pledgors were
signatories to the Settlement Agreement, only the Debtors gave deeds in lieu of foreclosure and
stood to lose their property immediately upon default. The Settlement Agreement was a
bankruptcy solution to a bankruptcy problem, just as the award of the adequate protection lien was
a bankruptcy solution to a bankruptcy problem. Contribution is not only a legal claim but also an

---

[11] "Claim" is broadly defined to include "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5)(A). Further, section 102(2) defines "claim against the debtor" to include a claim against property of the debtor. 11 U.S.C. § 102(2). When the Court entered the AP Order, the Court did not turn a secured non-recourse claim into a general unsecured claim. Rather, the Court provided Gateway adequate protection in the form of a replacement lien, limited to the value of the collateral. See <u>In re S. Vill., Inc.</u>, 25 B.R. 987, 999 n. 23 (Bankr. D. Utah 1982) ("adequate protection is tied to the value of the collateral and the allowed secured claim, sponsors of the Code noted that, even when a creditor makes an election under Section 1111(b)(2), 'that creditor is entitled to adequate protection of the creditor's interest in property to the extent of the value of the collateral.'"(citation omitted)).

equitable one, and courts have discretion to fashion a contribution award. See Cooper v. Greenberg, 191 Va. 495, 501 (1950); see also Floyd Davis Sales, Inc. v. Cent. Mortg. Corp. of Michigan, 197 Ga. App. 532, 533 (1990). In the context of setting an adequate protection claim in a bankruptcy case, the Court determines the best and equitable approach is to divide the amount paid by the Debtors only among the Debtors.

Moreover, the Debtor guarantors should be distinguished from the primary obligors, who are not counted for purposes of a contribution analysis in any event. A guarantor's liability is secondary, triggered by the borrower's default on the obligation that the borrower owes to the lender. Fields v. Willis, 123 Ga. 272 (1905); see also Kennedy v. Thruway Serv. City, Inc., 133 Ga. App. 858, 861 (1975) (guarantor's liability arises upon the default or failure of his principal to perform his undertaking); In re Clore, 547 B.R. 915, 921 (Bankr. C.D. Ill. 2016) (guarantor is only liable if the primary obligor defaults); In re SLC Ltd. V, 152 B.R. 755, 771 (Bankr. D. Utah 1993) (status as guarantors not the equivalent status of co-obligors on the underlying debt); Geppi v. Pineau, 2019 WL 6040499, at *4 (Md. Ct. Spec. App. Nov. 14, 2019) (guarantors are a "backstop for occasions when primary obligors fail to pay back deficiencies"). The four primary obligors (Niloy, NF, Mr. and Mrs. Thakkar) are excluded from the calculation because they are primary obligors. See O.C.G.A. § 10-7-41 ("Payment by a surety or endorser of a debt past due shall entitle him to proceed immediately against his principal for the sum paid, with interest thereon, and all legal costs to which he may have been subjected by the default of his principal."). Here, the primary obligors (Niloy, NF, and Mr. and Mrs. Thakkar) were liable to each guarantor for the full amount paid, not just a "fair share," and they should not be counted in the contribution calculation.

Plaintiff also argued that the pledgors were "obligors" who should share in the liability. The Loan Obligations were secured by pledges by Niloy and Rohan Thakkar and Sugarloaf Centre

Partners of certain of their ownership interests. But pledgors must be distinguished from the obligors and the guarantors because they are not personally liable for the debt. See In re Synergy Inv. Grp., LLC, 2014 WL 2006571, at *5 (Bankr. N.D. Ga. Mar. 18, 2014). One who pledges property to secure the note of a third party is not a co-signor and his liability is limited to the value of the property that stands behind the collateral mortgage. Pontchartrain State Bank v. Lybrand, 799 F. Supp. 633, 640 (E.D. La. 1992); In re Kaiser Steel Corp., 89 B.R. 150, 154 (Bankr. D. Colo. 1988); Fluke Cap. & Mgmt. Servs. Co. v. Richmond, 106 Wash. 2d 614, 621 (1986) (when property is pledged or mortgaged for a debt, "[t]he obligation of the property owner is limited to the land itself." (citing Restatement of Security § 83(c), comment *e*)); see also 74 Am. Jur. 2d Suretyship § 8; Restatement (Third) of Suretyship & Guaranty § 2, comment *c*. Thus, while the pledgors pledged their collateral as security for the debt (and their collateral was thus subject to being repossessed and sold), the Pledgors themselves were not liable personally for the debt.

The Settlement Agreement did not change the obligation of the pledgors. The Settlement Agreement identifies eleven "obligors": the primary obligors (Niloy, NF, Mr. and Mrs. Thakkar) and the guarantors (the five Debtors, Jax Financial, and N&R). The pledgors are identified, are signatories to the agreement and are included in the term "Loan Parties," but not "Obligors." The Settlement Agreement recites that "Obligors" jointly and severally owe certain sums to Wells Fargo (Recital G, A3, 5) and "Obligors" are in default (Recital H and ¶7). Only "Obligors" are required to pay all property taxes (¶9). It recognizes that the purpose of the Settlement Agreement was to give "Obligors" an opportunity to pay all obligations on or before the maturity date (¶10), and that only "Obligors" were to pay certain fees and expenses to Wells Fargo (¶10(c)(i)(C)), pay the Minimum Cash Payments and Indemnity Obligations (¶10(c)(i)(d) & (e), 10(c)(iv)), and pay

29

the Obligations by the Maturity Date (¶10(c)(i)(g)). It was the "Obligors" who were required to sell the encumbered real estate (¶10(C)(iii)(b) & (c)).

The Loan Parties (i.e., the pledgors) acknowledged that the representations and obligations of the Obligors were accurate and agreed to comply with all existing loan documents. The Loan Parties (i.e., the pledgors) agreed not to sue Wells Fargo, agreed to Wells Fargo's exercise of remedies upon a default, and released Wells Fargo. Nothing in the Settlement Agreement, though, makes the pledgors jointly and severally liable with the Obligors on the Wells Fargo debt or changed their agreement from one of pledging collateral only. The pledgors liability remained limited to the equity interests pledged.

In re Toy King Distributors, Inc., 256 B.R. 1, 182 (Bankr. M.D. Fla. 2000), cited by Plaintiff, is an example of how to factor in limited liability guarantors, but it does not address pledgors. Even if the Court applied a Toy King type analysis to the pledgors, the amount would be limited to the value of the pledged property. As discussed above, the pledged property is equity interests in NRCT, NF, Jax Financial, Nilhan Developers, and Sugarloaf. No evidence was presented from which the Court can make a finding as to the value of the pledged property and even Gateway does not suggest a number. Gateway's argument that the pledgors share liability equally with the Obligors is simply wrong.

The Court concludes the "denominator" is five, representing the five Debtors. Dividing by five makes sense in this bankruptcy context and recognizes that the Debtor guarantors are different from the primary obligors (who are liable for the full amount paid, not just a "fair share") and the pledgors (who were liable only to the extent of the equity interests pledged).

### C.    Time Period

The second issue is the applicable time period for the contribution analysis. Plaintiff argues only post-petition payments should be considered and relies on the Dopp Report, which considered the relevant time period to be from August 15, 2015 to May 2017 (after the DCT foreclosure). Defendant contends that all amounts paid on the Wells Fargo debt including that paid prior to the bankruptcy filing should be considered in determining any contribution claim or, at a minimum, that all post-petition payments should be considered.

Plaintiff contends the Dopp Report was correct in choosing August 2015 as the start date. The start date was selected by the Trustee's counsel and not Mr. Dopp. It was selected because the Settlement Agreement between Wells Fargo, the Debtors, and non-Debtor obligors stipulated the outstanding debt was $22,561,967.14 as of August 31, 2015. Mr. Dopp only considered payments made on the Wells Fargo debt after August 15, 2015. Plaintiff contends the post-petition date is correct because the right to contribution begins when there is a default by the primary obligor and a payment by a guarantor. See Steele, 232 Ga. App. at 848 (1998). Payments by the guarantors did not begin until post-petition and the Wells Fargo debt was not satisfied until years after the petition date. Plaintiff also notes that if the Court were to consider payments before August 15, 2015, the "beginning date" is not as clear because the Wells Fargo debt was modified several times over the years.

Defendant argues that the relevant time period begins with the initiation of the loans, or at least when the current iteration of the loans was executed on April 30, 2013. The original loan dates back twenty years. The loan in default as of the petition date was the loan as amended and restated in 2013. This loan was significantly different from prior loans as obligors and amounts changed. Most significant to this inquiry, though, is the fact the Debtors did not guarantee all debts

until 2013 and new guarantors were brought into the transaction then, including the Plaintiff here. Moreover, the 2013 Loan Agreement said the 2013 notes amended, restated, and <u>superseded</u> the prior notes, and the Wells Fargo proof of claim was based only on the 2013 Loan Obligations.

The Court concludes the post-petition period is the relevant time period for determining contribution rights in this context. The Court, at the May 30, 2019, hearing on the adequate protection claim, was focused on the post-petition period. The impetus for the sale of Bay Circle's property was the Settlement Agreement with Wells Fargo, which set various deadlines for interim payments and release prices for seven properties owned by the Debtors that secured its lien. The Settlement Agreement did not affect property of non-Debtors. Only the Debtors provided deeds in lieu of foreclosure. The Settlement Agreement contemplated the Debtors would sell property to pay Wells Fargo in full and to avoid foreclosure or the recording of a deed in lieu of foreclosure. The Settlement Agreement was negotiated fully during the bankruptcy cases and approved by the Bankruptcy Court. It provided the Debtors the breathing spell they sought when they filed bankruptcy and primarily addressed the Debtors, their property, and their bankruptcy cases.

Moreover, this claim is brought in the context of determining Gateway's adequate protection claim which arose in the bankruptcy case. Adequate protection claims are created by the Bankruptcy Code, 11 U.S.C. §§ 361 & 363, and are a bankruptcy remedy. It is therefore appropriate to use the petition date as the starting point and to include all payments made by the Debtors post-petition in the analysis. If the Court were to consider pre-petition payments, it would use April 30, 2013 as the starting point. But the analysis would not change, as no evidence was presented that the guarantors made any payments on the loan from April 30, 2013 through the petition date. Mr. Thakkar confirmed as much when he testified that all pre-petition payments were made by Niloy, NF, or him.

### D.    Insolvency

In the previous section, the Court decided the appropriate denominator was the five Debtors. The Defendant contends they are all insolvent. As explained in the Order Denying Summary Judgment (Doc. No. 104), a co-obligor's insolvency must be judicially determined. Appleford v. Snake River Min. Mill. & Smelting Co., 122 Wash. 11, 20 (1922). Unless a co-obligor's insolvency has been judicially determined, the court presumes that all co-obligors are solvent. 18 Am Jur 2d Contribution § 25; Gideon v. Johns–Manville Sales Corp., 761 F.2d 1129 (5th Cir. 1985). In other words, all are equally liable unless established otherwise.

The effect of the presumption is merely to shift the burden of going forward with evidence, and not the burden of proof. Plaintiff contends, though, that the burden of proving insolvency shifted to Defendant when it asserted insolvency as an affirmative defense. Under Georgia law, the burden of proof on elements of a claim remains with the plaintiff even where the defendant asserts an "affirmative defense" challenging or denying one of those elements. O.C.G.A. § 24-4-1 (2010); Lovett v. Am. Family Life Ins. Co., 107 Ga. App. 603, 607-08 (1963). An affirmative defense is one where the defendant admits the essential facts of a claimant's claim but provides additional facts extraneous to the plaintiff's prima facie case to establish that they are not liable. Whitley v. Wilson, 90 Ga. App. 16, 17-18 (1954); see also Flav-O-Rich, Inc. v. Rawson Food Serv., Inc. (In re Rawson Food Serv., Inc.), 846 F.2d 1343, 1349 (11th Cir. 1988). The burden of proving that affirmative defense is on the defendant. See Brown v. Tucker, 337 Ga. App. 704, 715 (2016). But, where a defendant merely negates an element of a claim, even if the defendant titles the negation as an "affirmative defense[,]" it is not in fact an affirmative defense. See Flav-O-Rich, Inc., 846 F.2d at 1349. So-called "affirmative defenses" that deny specific elements of a claim do not shift the burden of proof. Whitley, 90 Ga. App. at 18, 81 S.E.2d at 879. Moreover, the Court

notes the affirmative defense asserted by NRCT was that it was insolvent at the time of certain transactions. The Court has now determined that the applicable date for determining solvency is the date of trial, so the "affirmative defense" is not relevant.

While the burden of proof remains on Plaintiff, Defendant, as the party against whom the presumption operates, must come forward with evidence to rebut the presumption of solvency. See Heard v. Lovett, 273 Ga. 111 (2000); Cent. of Georgia Ry. Co. v. Hester, 94 Ga. App. 226, 226 (1956). To overcome the presumption that all co-obligors are solvent, the opponent must produce evidence sufficient to create a state of "equipoise" between his proof and that of the adversary. Complete Auto Transit, Inc. v. Baggett, 107 Ga. App. 415, 415 (1963); see also Gray v. Currie, 2005 WL 3132351, at *3 (N.D. Ga. Nov. 22, 2005). This procedure is similar to the claim objection procedure in bankruptcy where the objecting party must "produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." In re 3333 Main, LLC, 2014 WL 2338273, *3 (Bankr. D. Conn. May 29, 2014). Similarly, to rebut the presumption of insolvency in a preference action under section 547, the defendant must "produce non-speculative evidence that would support a finding that the 'fair' value of [the debtor's] property exceeded [the debtor's] debts [.]" In re The Heritage Org., LLC, 413 B.R. 438, 500 (Bankr. N.D. Tex. 2009). Here, Plaintiff is entitled to the benefit of the presumption that all co-obligors are solvent, and Defendant has the burden of coming forward with evidence to rebut or meet the presumption.

As for how to define solvency, contribution is not a bankruptcy concept, but bankruptcy law provides guidance on determining insolvency. The Bankruptcy Code defines "insolvent" in section 101(32)(A) to mean "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation[.]" 11 U.S.C. § 101(32)(A). This test,

commonly referred to as the balance sheet test, does not involve a simple comparison of balance sheet assets and liabilities. Robert J. Stearn, Jr., Cory D. Kandestin, Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of Solvency Tests Under the Bankruptcy Code and Delaware Law, 36 Del. J. Corp. L. 165, 172–73 (2011). A court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet, and the court may examine the company's assets and adjust values on a balance sheet as appropriate. Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002), aff'd sub nom. In re USN Commc'ns, Inc., 60 F. App'x 401 (3d Cir. 2003); see also In re Trans World Airlines, Inc., 180 B.R. 389, 405 n. 22 (Bankr. D. Del. 1994) (noting that balance sheet is only the starting point in the analysis).

When using a balance sheet approach, liabilities must be valued from the perspective of the debtor. In re Commercial Fin. Servs., Inc., 350 B.R. 520, 554 (Bankr. N.D. Okla. 2005). "In calculating the debtor's balance sheet, the court should consider . . . only those debts that are valid under applicable state or federal law[.]" Taylor v. Riverside-Franklin Props., Inc. (In re Taylor), 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998). "Thus, the mere fact that a liability appears on the debtor's balance sheet does not necessarily mean that the liability should be treated as a debt for purposes of the balance sheet test." Robert J. Stearn, Jr., Proving Solvency: Defending Preference and Fraudulent Transfer Litigation, 62 Bus. Law. 359, 382–83 (2007). As one court explained, the question in determining insolvency "is not whether a journal entry should have been made, but whether a true liability existed." In re WRT Energy Corp., 282 B.R. 343, 390 (Bankr. W.D. La. 2001). "The Court must consider the totality of the circumstances to determine if the obligation is, in fact, debt[.]" In re EBC I, Inc., 380 B.R. 348, 358 (Bankr. D. Del. 2008), aff'd, 400 B.R. 13 (D. Del. 2009), aff'd, 382 F. App'x 135 (3d Cir. 2010). For example, in WRT Energy Corp., the court concluded unrecorded invoices for preferred stock payable at the discretion of the debtor should

not be considered debt for purposes of determining whether the debtor was insolvent under the balance sheet test. 282 B.R. 343; see also Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.), 143 B.R. 468, 473 (Bankr. E.D. Tenn. 1992), aff'd, 112 F.3d 234 (6th Cir. 1997) (deferred income and the deferred income tax shown as liabilities on financial statement should not have been counted as debts).

Elsewhere in the Bankruptcy Code, insolvency is defined to mean not paying your debts as they come due. This is the "cash flow test." "To apply the test, an overall assessment must be made of the debtor's liquidity, which then should be compared to projected debt payments." Stearn, Jr., 36 Del. J. Corp. L. at 173. For example, section 548 addresses fraudulent transfers and provides that a transfer may be avoided if, among other things, it was made while the debtor was unable to pay its debts as they came due. 11 U.S.C. § 548(a)(1)(B)(ii)(III). Similarly, section 303(h)(1) provides that the bankruptcy court shall enter an order for relief if a petitioning creditor establishes that the proposed debtor is generally not paying its debts. 11 U.S.C. § 303(h)(1). This section is subject to an important exception: debts that are subject to bona fide disputes as to liability or amount are excluded from the consideration of "generally not paying debts." "The Bankruptcy Code does not provide a definition for the term 'generally not paying [debts]' and courts have been reluctant to adopt a mechanical test for determining whether a debtor is generally paying his or her debts as they come due." In re Ex-L Tube, Inc., 2007 WL 541670, at *4 (Bankr. W.D. Mo. Feb. 16, 2007). Rather, courts consider several factors including: "the number of debts; the amount of the delinquencies; the materiality of the nonpayments; and the nature of the alleged debtor's conduct of his or her financial affairs." Id.

Non-bankruptcy law also uses both balance sheet and cash flow tests. The Georgia Uniform Voidable Transactions Act ("UVTA") incorporates a balance sheet test, providing "[a] debtor is

36

insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." O.C.G.A. § 18–2–72(a); Target Corp. v. Amerson, 326 Ga. App. 734, 741-42 (2014). But, the UVTA also incorporates the "generally not paying" standard and provides "[a] debtor who is generally not paying his or her debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent." O.C.G.A. § 18–2–72(b); see also In re Gregg, 2013 WL 3989061, *17 (Bankr. M.D. Ga. July 2, 2013). Similarly, Georgia law defines insolvency using either a cash flow or balance sheet test when determining whether a corporate director may sell corporate property without shareholder approval. O.C.G.A. § 14-2-1201(a) (defining insolvency to mean "(1) The corporation would not be able to pay its debts as they become due in the usual course of business; or (2) The corporation's total assets would be less than the sum of its total liabilities."); see also U.S. Cap. Funding VI, Ltd v. Patterson Bankshares, Inc., 137 F. Supp. 3d 1340, 1376 (S.D. Ga. 2015).

Defendant argues that because the Debtors are in bankruptcy, they should be presumed insolvent, but the law of contribution does not provide for such a presumption. Other laws do incorporate a presumption of insolvency for example for preference avoidance purposes and avoidance under the UVTA. See 11 U.S.C. § 547(f); O.C.G.A. § 18-2-72(b). Those presumptions, however, are for the purpose of those statutes. See 11 U.S.C. § 547(f) ("For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." (emphasis added)). The Court is not applying the UVTA or section 547, so it is not obligated to use those presumptions of insolvency. The Court has already ruled that for contribution the presumption is that the obligors are solvent. In the context of a contribution action, evidence of bankruptcy is some evidence of insolvency, but it is

not dispositive. See Gideon, 761 F.2d at 1140. Further, the time of determining insolvency is the time of trial. See Jewett, 118 N.Y.S. at 641; Harris, 542 N.E.2d 77.

Ultimately, whether an entity or a person is insolvent is a fact specific inquiry. Lawson v. Ford Motor Co. (In re Roblin Indus.), 78 F.3d 30 , 35 (2d. Cir. 1996). "The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency," id., and "any appropriate means" may be used to prove insolvency. Matson v. Strickland (In re Strickland), 230 B.R. 276, 282 (Bankr. E.D. Va. 1999). The type of evidence presented, however, must be persuasive. A determination of insolvency should be based on appraisals or expert testimony "whenever it is possible." Id. at 282. Some courts have found unaudited financial statements insufficient to rebut a presumption because they do not necessarily reflect the fair value of assets or all liabilities. The Heritage Org., 413 B.R. at 500.

Defendant contends it and its affiliates were insolvent at the trial date. In support of this argument, Defendant refers to exhibits prepared by Mr. Thakkar and to Mr. Thakkar's testimony. Plaintiff contends Defendant improperly created home cooked insolvency analyses a few days before trial, and that it has not rebutted the presumption of solvency. The exhibits on which Defendant relies were excluded from trial and not admitted into evidence since they were not filed in a timely manner and had other admissibility issues. Defendant sought reconsideration of the Court's order denying their admission, which the Court denied (Doc. No. 256). Mr. Thakkar testified generally as to the operating status of the various entities and persons and the assets and liabilities of each. Although Mr. Thakkar was not designated or qualified as an expert, the Court permitted him to testify as a representative of the entities based on personal knowledge and weighs his testimony accordingly. The Court's findings of facts as to solvency are as follows.

1.      **Debtors**

   *a)*      ***Debtors other than NRCT***

Defendant argues that all the Debtors, including itself, were insolvent as of the time of trial and should therefore be excluded from the calculation. Defendant's position here is not logical. Defendant seems to want to exclude all Debtors from the contribution analysis, even those that paid on the debt. It is undisputed that, during the course of the Bankruptcy Case, four of the five Debtors made ongoing payments towards the Wells Fargo debt. Bay Circle paid $5,569,190.26, DCT paid $3,181,696.98, Sugarloaf paid $7,383,196.86, and Nilhan Developers paid $7,993,778.94. If all are excluded, everyone's liability is $0, even the four Debtors who paid substantial sums.

The Georgia statute does not require the Court to ignore insolvent guarantors who actually paid on the debt. Instead, in determining each party's "fair share," all parties are considered. Their insolvency is only an issue if a party did not contribute its fair share, in which case the shortfall is redistributed to the solvent parties. "If one of the cosureties is insolvent, the deficiency in his share must be borne equally by the solvent sureties." O.C.G.A. § 10-7-50. "When, because of insolvency, . . . the contribution obtained from a cosurety after reasonable collection efforts is less than that cosurety's contributive share, the contributive shares of the other cosureties as among themselves are recalculated[.]" Restatement (Third) of Suretyship & Guaranty § 57(2)(b) (1996). "In such a case, the solvent and available cosureties must contribute a larger share. If some part of his contributive share is obtained from an insolvent surety, this will be considered in decreasing the amount of contribution from the others." Restatement of Security § 154, Comment h; see also Toy King Distributors, Inc., 256 B.R. 1 (calculating contribution when some parties had limited liability).

Here, the evidence showed, and the parties did not dispute, that Nilhan Developers and Sugarloaf paid more than their fair share under any analysis. Their present insolvency does not change that outcome. Likewise, the parties agree that DCT is presently insolvent and, if it did not pay its fair share, it cannot pay more. Finally, Bay Circle is the party <u>seeking</u> contribution. Its insolvency is only relevant if it has paid less than its fair share. This whole proceeding is based on the premise that it paid <u>more</u> than its fair share, so its insolvency is not relevant.

### b)     NRCT

The primary solvency issue is whether NRCT is solvent as of the date of trial. Defendant argued at trial that it was insolvent, but this position conflicts with the evidence, and the position taken by Defendant, its equity holders, and its manager during the case. In particular, NRCT has filed schedules and pleadings that are judicial or evidentiary admissions.

"Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding [on] the party making them[.]" <u>In re Hoffman</u>, 605 B.R. 560, 564 (Bankr. N.D. Ga. 2019), <u>subsequently rev'd sub nom.</u> <u>In re Hoffman</u>, 22 F.4th 1341 (11th Cir. 2022); <u>see also</u> <u>Keller v. U.S.</u>, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995); <u>In re Summit United Serv., LLC</u>, 2005 WL 6488106, at *4 (Bankr. N.D. Ga. Sept. 19, 2005). "Judicial admissions must be clear, deliberate, and unequivocal factual assertions—whether made in pleadings, stipulations, responses to discovery, or orally in trial or court proceedings . . . ;[a] statement that is a legal conclusion, however, does not constitute a judicial admission." <u>In re Malia</u>, 2012 WL 909738, at *2 (Bankr. N.D. Ga. Feb. 8, 2012). Statements as to a debtor's solvency or insolvency in bankruptcy schedules or court filings may be considered judicial admissions. <u>See e.g.,</u> <u>In re Morreale</u>, 2015 WL 3897796, at *9 (Bankr. D. Colo. June 22, 2015) (representations made in disclosure statement that debtor was nowhere near solvency was a judicial admission or, at least,

an evidentiary admission); In re Sissom, 366 B.R. 677, 697 (Bankr. S.D. Tex. 2007) (debtor prevented from asserting solvency where, after five amendments, his schedules showed him to be insolvent).

Judicial admissions may not be controverted unless the court permits the admission to be withdrawn or the pleading containing the admission is amended or withdrawn. Summit United, 2005 WL 6488106, at *4. Judicial admissions are not evidence, but "have the effect of withdrawing a fact from contention." Id. (citation omitted). Evidentiary admissions, on the other hand, are not conclusive but are evidence to be taken into consideration by the court. Asarco, LLC v. Noranda Mining, Inc., 844 F.3d 1201, 1212 n.3 (10th Cir. 2017). "Statements in bankruptcy schedules are executed under penalty of perjury and, when offered against a debtor, [may be treated] as judicial admissions." Hoffman, 605 B.R. at 565 (citing In re Vanguard Airlines, Inc., 298 B.R. 626, 635 (Bankr. W.D. Mo. 2003)). "Once it is determined that a statement is a judicial admission it is within the court's discretion whether to accept or reject it." Oak Mill Ent.2000 Inc v. Knopfler (In re Schraiber), 141 B.R. 1000, 1006 (Bankr. N.D. Ill. 1992). In evaluating NRCT's assets and liabilities as of trial the court will construe the numerous statements made by NRCT, its owners, Mr. Thakkar, and their counsel as at least evidentiary admissions.  The statements made on multiple occasions in different contexts and formats were deliberate, clear, and unequivocal statements made in the course of judicial proceedings, on which they intended the Court to rely.

### (1)    Balance Sheet Evidence

### (a)    Assets

When NRCT filed bankruptcy in 2015, it filed schedules of its assets and liabilities under oath. These statements are judicial admissions. Hoffman, 605 B.R. at 566. The schedules listed the following assets:

41

- 9.9 acres undeveloped land on Tench Road, Gwinnett County, Georgia valued at $2,512,558;
- 36 acres on Peachtree Industrial, Gwinnett County, Georgia valued at $5,450,960;
- 46.7 acres on Block Knob, Pickens County, Georgia valued at $316,532;
- A residential lot on 620 Grand Harbor Blvd, Greenwood, South Carolina valued at $364,825;
- A Bank of America checking account with $1,703.27;
- An investment in DB Asia Fund valued at $1,320,835;
- An investment in DB Energy Select valued at $685,609;
- A 100% interest in Shops At New Hope, LLC (value TBD); and
- A 50% interest in Sugarloaf Centre Partners, LLC (value TBD).

During the case, some assets were liquidated. The Trustee sold the Tench Road Property on August 12, 2019 for $2,000,000.00, generating proceeds to NRCT's estate in the amount of $1,985,865.06 (Case No. 15-58440 Doc. No. 1185). On February 4, 2022, the Court granted a motion to sell property at 620 Grand Harbor Blvd for $225,000, the proceeds of which ($220,345.14) were deposited into the Court Registry on February 8, 2022 (Case No. 15-58444 Docs. Nos. 319 & 323). Pursuant to the Contribution Fund Order, the Plan Agent deposited $2,104,129.27 into the Court Registry (Case No. 15-58444 Doc. No. 327). Professional fees have been paid and, as of the date of trial, the principal balance of funds in the Court Registry is $2,660,765.00.

As of trial, NRCT continued to own the 36 acres on Peachtree Industrial, Gwinnett County and the 46.7 acres on Block Knob, Pickens County. The scheduled value of these properties combined is $5,767,492. Mr. Thakkar testified at trial these properties combined were worth $5.2 million. The Court notes that property values have generally increased over the last seven years. The Court also finds NRCT continued to carry the property on its ledger at the scheduled value. The Court concludes the higher scheduled value is the appropriate value of the properties.

As of trial, NRCT also owned the Asia Fund with a value of $157,808.50. Mr. Thakkar testified NRCT no longer owns its interest in the Shops At New Hope, LLC (although the interest

was not disposed of during the case or subject to Court approval), and he assigned no value to NRCT's 50% interest in Sugarloaf Centre Partners, LLC. Assets as of trial were:

- 36 acres:            $5,450,960;
- 46.7 acres:          $316,532;
- Registry funds:      $2,660,765;
- Asia Fund:           $157,808;
- **Total:**           $8,586,065.

### (b)    Liabilities

NRCT's scheduled liabilities in 2015 were:

- NF in the amount of $13,953,776;
- NF in the amount of $91,524; and
- Engineered Earth Solutions in the amount of $12,937.50.

Of course, NRCT was also liable for the $20 million plus Wells Fargo debt. Additionally, proofs of claim were filed by Gateway and Peachtree Hotel Group, both of which were resolved: Gateway's proofs of claim were disallowed (Case No. 15-58440 Docs. Nos. 578 & 579), and the Peachtree Hotel Group claim was settled (see Adv. Proc. No. 15-5418 Doc. No. 19).

Several actions have occurred in the case to satisfy or eliminate all scheduled and filed claims. First, the Wells Fargo debt has been satisfied. Second, the Court has disallowed the NF claim of $13,953,776. Third, all general unsecured creditors have been paid.

The history and basis for disallowance of the NF claim are important to the ultimate ruling on NRCT's solvency. On December 6, 2019, Rohan and Niloy Thakkar, as equity of NRCT, objected to the $13,953,776 scheduled claim of NF and sought to amend NRCT's schedules or, in the alternative, to require the Trustee to amend the schedules to reflect the claim of NF as disputed and subject to offset (Case No. 15-58440 Doc. No. 1269).[12] The Court held an evidentiary hearing on the motion at which Mr. Thakkar testified. He explained, and the Court found, the claim was

---

[12] As no objection was stated to the claim of $91,524, that claim of NF was allowed (Case No. 15-58440 Doc. No. 1347, as amended and restated at Doc. No. 1365).

only a book entry allocation of the Wells Fargo debt without support. He contended the entry was not based on actual funds provided by NF to NRCT and the Court agreed. He also argued, and the Court agreed, that because Wells Fargo had been paid in full, the allocation was no longer owed regardless of who advanced the funds.

Finally, all claims against NRCT, including the $91,524 claim of NF and the claim of Engineered Earth Solutions, have been paid as of the time of trial pursuant to the confirmed plan. So, based on the schedules made under oath, all claims against NRCT have been paid, with the exception of the disputed Contribution Claim for which NRCT has placed funds in the Court Registry. This analysis shows NRCT was solvent at the time of trial under the balance sheet test.

At the trial, Mr. Thakkar suddenly argued that NRCT owed Niloy $14 million. He argued that the NF claim scheduled in the NRCT case, and later disputed, was actually a claim of Niloy and undisputed. This testimony lacks credibility and is inconsistent with the Court's findings with respect to the NF claim, Mr. Thakkar's prior testimony, and the evidence.

First, NRCT never scheduled Niloy as a creditor and schedules are judicial admissions. Hoffman, 605 B.R. at 566. The Thakkars moved to amend the schedules to disallow the claim of NF, but they never moved to amend the schedules to add Niloy as a creditor. Niloy never filed a claim in the case or objected to the plan that made no provision for its payment, or cast a ballot on the plan, even though Mr. Thakkar is the manager of Niloy. The Court has reviewed the NRCT ledger, balance sheets, and tax returns and finds no support for a debt to Niloy. Just as with the analysis of the NF claim in the NRCT case, no note exists from NRCT to Niloy. The NRCT ledger shows only $34,132.89 owed to Niloy as of January 25, 2019. This same ledger shows $13,359,928.80 owed to Owner/Member. But, just as with NF, Niloy was not and is not an owner or member of NRCT. Until several months ago, the only owners were Niloy and Rohan Thakkar.

(As of February 1, 2022, Mr. Thakkar acquired a 5% interest in NRCT from Rohan Thakkar.) The due to Owner/Member entry provides no support for a claim to Niloy.

The 2015 NRCT tax return provides no support either. While it lists a loan payable of approximately $14 million, it does not identify to whom the loan is owed. Similarly, the balance sheets filed by NRCT with its monthly operating reports show over $13 million as "Due to affiliates" without identifying those affiliates. Like the disputed NF claim, NRCT has presented no note or other evidence of debt. Finally, to the extent the book entries reflect NRCT's "portion" of the Wells Fargo debt, that debt has been satisfied. Mr. Thakkar argued NF's claim was satisfied when the Wells Fargo debt was satisfied, and the Court agreed. The outcome is no different just because he now labels it as due to "Niloy[.]" See WRT Energy Corp., 282 B.R. at 390 (The question in determining insolvency "is not whether a journal entry should have been made, but whether a true liability existed."); see also EBC I, Inc., 380 B.R. at 358.

Second, the position that NRCT is insolvent because it owes debt to Niloy is inconsistent with the Examiner's reports. The Examiner performed an analysis of the intercompany debts among the Thakkar Entities. She filed two reports on the topic. Both reports observe the intercompany accounting for NRCT was slightly different from that in the other Debtors' books: while the books of the other Debtors showed specific amounts owed to NF related to the Wells Fargo debt (and a corresponding entry by NF) and a separate "due to/from affiliates" account, NRCT in "prior years" consolidated its liability on the guaranties of the Wells Fargo debt with "Due to/from Owner." (Case No. 15-58440 Doc. No. 274.) The Examiner reflected the amounts due to the owner or member being $14,538,049.89 but stated there was no support for that claim. The Court found no evidence that such funds actually flowed from NF to NRCT and there is none to show funds flowed from Niloy to NRCT. Nothing in the Examiner's reports indicates or

45

supports that NRCT actually owed $14 million to Niloy. Instead, her report shows only $15,817 was owed to Niloy and that amount was not scheduled by the Debtor.

Third, the position that NRCT owes money to Niloy is inconsistent with Mr. Thakkar's testimony and evidence that NF was the "lender" to Thakkar affiliates. Notably, Wells Fargo, in its credit review, described Niloy as a company "providing infrastructure management services . . . [w]ith over 28 years of IT experience[.]" (Doc. No. 187 at 14.) NF was described as "the financial arm for various investment companies." Id.  Mr. Thakkar likewise testified Niloy was in the IT business and NF was the "conduit" for "tracking the payments." (Doc. No. 226-3, p. 231-32). He also testified that although NRCT may have acquired its property before NF became the borrower to Wells Fargo, the debt definitely "went over" to NF once it became an obligor. (Case No. 15-58440 Doc. No. 1326 p. 95-96.)

Fourth, if the "Due to owner" entry was meant to be an allocation of the Wells Fargo debt to NRCT by Niloy, the book entry does not say so since Niloy was not an owner. NRCT provided no evidence to support that book entry was meant to reflect debt to Niloy. Moreover, if the book entry was meant to be an allocation of the Wells Fargo debt, that was satisfied when the debt to Wells Fargo/Bay Point was satisfied. No further sums were due to Wells Fargo/Bay Point by Niloy or anyone else and no evidence supports a conclusion that NRCT owed that allocation to anyone notwithstanding Wells Fargo/Bay Point's payment in full.

All these facts led Mr. Dopp to conclude in his report that NRCT was solvent. They also led Mr. Glass to testify in his deposition that he believed NRCT was solvent. In their depositions, Mr. Thakkar, Niloy and Rohan Thakkar could not state whether NRCT was solvent. NRCT has not filed a tax statement since 2015, and produced no financial statements, so there is no documentary evidence of the company's condition other than the operating reports and other

documents filed in the bankruptcy case. The Court concludes that notwithstanding the Defendant's arguments, NRCT is solvent as of the time of trial under the balance sheet test.

### (2)   Evidence of Paying Debts as They Come Due

As of the time of trial, NRCT was paying its debts as they came due. The Plan Agent has filed periodic status reports that indicate NRCT has been paying its bills as they arise. In her Third Status Report, she stated she "paid all of the real property taxes due for 2021 related to the properties located in Gwinnett County and Pike County, Georgia," planned to pay the tax bill for the South Carolina property "in advance of its deadline in early 2022," and had paid a vendor for clean-up (Case No. 15-58444 Doc. No. 290.) Based on a review of NRCT's monthly operating report, NRCT does not appear to have any employees or other significant ongoing expenses. Defendant has presented no evidence to show NRCT has not been paying its debts as they come due. To the contrary, the evidence suggests NRCT does not have a large number of debts or delinquencies and is generally paying expenses when they become due.

### (3)   Prior Positions of the Parties

Moreover, the Court's finding and conclusion that NRCT is solvent is consistent with the positions of the parties throughout this case. NRCT, its equity members, its manager, and counsel have made numerous statements on the record in these proceedings that NRCT is solvent. As the Court observed in February 2020 in connection with the objection to the NF claim, "in all the time we talked about the contribution claim of Bay Circle against NRCT, no one ever raised the possibility that NRCT would be paying the NF Trustee thirteen and a half million dollars, and perhaps not have the money to fund the contribution claim. No one ever raised that. . . . And at that point, no one was discussing the possibility that there was a real claim out there that was going

to have to be paid that might deplete the estate or might affect Gateway's ability to recover on that contribution claim."

Moreover, Niloy, N&R, Jax Financial, Niloy Thakkar, and Rohan Thakkar filed on May 23, 2019 a Response and Objection to Chapter 11 Trustee's Motion Requesting Determination of the Amount of Debtor Bay Circle Properties, LLC's Contribution Claim stating: "With respect to NCRT, the only debtor from which the Trustee seeks a contribution claim on behalf Bay Circle, it is a solvent company with substantial assets[.]" (Case No. 15-58440 Doc. No. 1067.) Then, at a hearing on May 30, 2019, counsel for NRCT's equity members (Henry Sewell) stated "NRCT is a solvent [e]state. . . there's pretty significant equity in this estate." (Case No. 15-58440 Doc. No. 1481 at p. 61-2.). Counsel pointed out that, "Every dollar that comes out of [the estate] . . . comes out of their pockets essentially." Id. at p. 68:5-8.

Mr. Thakkar has maintained throughout the bankruptcy case that NRCT was solvent. In an email from May 7, 2018 to his counsel, Mr. Thakkar stated, "Assets of NRCT far exceed amount necessary to satisfy these claims[.]" (Doc. No. 178 Ex. 214.) Mr. Thakkar later sought dismissal of the NRCT case on May 20, 2019 (Case No. 15-58440 Doc. No. 1060), and again on April 20, 2020 (Case No. 15-58440 Doc. No. 1394), on the basis sufficient funds were on hand to pay all allowed claims. Mr. Thakkar also filed an Objection to  Second Amended Plan of Liquidation for Debtor NRCT, LLC Proposed by Ronald L. Glass, as Chapter 11 Trustee (Case No. 15-58444 Doc. No. 105) on June 5, 2020, in which he stated: "There are sufficient assets available to immediately satisfy all allowed undisputed general unsecured claims and to satisfy the estimated administrative expense claims. Even if judgment is entered against the Debtor in the Contribution Action for the maximum amount there are still sufficient assets to satisfy the Contribution Claim and assets would remain after satisfaction of said claim. This is a surplus case." Rohan and Niloy

Thakkar joined in Mr. Thakkar's objection and adopted his arguments (Case No. 15-58444 Doc. No. 108). Mr. Thakkar, Rohan and Niloy Thakkar, as equity/interest holders of NRCT, then filed a Supplement to Objection (Case No. 15-58444 Doc. No. 110) in which they repeated, "there are sufficient funds to pay all administrative, priority and general unsecured claims, in full at confirmation, along with an additional $1,500,000 of cash, land worth $3,000,000.00 to $5,000,000.00, or more, and marketable securities of approximately $1,100,000.00."

At a hearing before the Court on June 9, 2020, counsel for Mr. Thakkar (Denise Dotson) stated the case was a surplus case (Case No. 15-58444 Doc. No. 116). At the same hearing, counsel for equity members Niloy and Rohan Thakkar (John Moffa) argued "this particular case being a surplus case under any scenario, also has to be appropriate for equity." He argued that the case should be dismissed stating, "If this weren't a surplus case, that would be a completely different story, but it is a surplus case. Nobody's told the Court that it's not."

The Court finds no evidence to support an obligation of NRCT to Niloy. Considering the totality of the circumstances and all of the evidence, under any test, NRCT is solvent. Its current position that it is insolvent is not tenable and not supported by the evidence. Accordingly, the Court concludes NRCT has not rebutted the presumption of solvency for the purposes of this calculation.

### 2.    Other Guarantors

To the extent solvency of the guarantors is relevant, the Court reviews the evidence as to Jax Financial and N&R.

#### a)    *Jax Financial*

Limited evidence regarding Jax Financial is in the record. Mr. Thakkar testified Jax Financial had $11 million in liabilities to insiders and only $17-18,000 in cash. From the docket,

the Court can see Jax Financial loaned money (the source is unknown) to Jax Fairfield Hotel Group LLC ("Jax Hotel") to buy a hotel. In 2012, the hotel was sold and Jax Financial took a note from the purchaser for a part of the purchase price. Jax Hotel then "participated" in the note. Jax Financial first became a guarantor of the Wells Fargo debt with the 2013 restructure and the proceeds of this note were pledged to Wells Fargo. The note on the hotel was repaid in May 2014. One of the partners in Jax Hotel then sued Jax Financial, Wells Fargo, the Debtors, and other obligors and guarantors of the note alleging the funds were paid to Wells Fargo rather than to the hotel partners. This adversary proceeding was ultimately settled on undisclosed terms and dismissed. But, Jax Financial appears to have continued in business for many years thereafter with transfers to and from Sugarloaf, Nilhan Developers, and NRCT, even post-petition as reflected on operating reports and financial documents. For example, NRCT's monthly operating report for November 2017 shows Jax Financial had transferred $220,810 to NRCT post-petition, and the Trustee alleged NRCT transferred $600,000 in May 2018 via wire transfer to JAX Financial (Case No. 15-58440 Doc. No. 1280).

The Court concludes Mr. Thakkar's testimony does not provide credible evidence to meet the presumption of solvency. Mr. Thakkar's testimony is self-serving and has no independent verification. Moreover, liabilities to insiders may be disregarded in assessing balance sheet solvency, particularly where, as here, there is no supporting evidence. See WRT Energy Corp., 282 B.R. 343. Finally, no evidence was presented as to Jax Financial's ability to pay debts as they come due. Defendant has not rebutted the presumption of Jax Financial's solvency.

    *b)*  *N&R*

The Court finds the presumption of solvency has been rebutted as to N&R. N&R has no assets and no operations. N&R was set up to invest in companies. It was an owner of OGP, which

filed its own bankruptcy case in the Middle District of Florida (Case No. 6:15-bk-03448-MGW). N&R is also subject to the $15 million Gateway judgment. Plaintiff did not generate any contrary evidence of solvency. The Court finds N&R is insolvent as of the date of trial.

### 3.   Primary Obligors

Although the Court has determined to exclude Mr. Thakkar, Ms. Thakkar, NF, and Niloy from the contribution allocation because they are primary obligors, to the extent they should be included in the allocation, the Court makes the following findings of fact as to their solvency.

#### a)   *Niloy*

Niloy is presumed to be solvent. Defendant offered no evidence to rebut the presumption.

#### b)   *Mrs. Thakkar*

Mrs. Thakkar is presumed to be solvent. Defendant offered no evidence to rebut the presumption.

#### c)   *Mr. Thakkar*

The Court finds that the presumption of solvency has been rebutted as to Mr. Thakkar. Gateway holds a personal judgment against Mr. Thakkar in the amount of approximately $15 million. Mr. Thakkar testified he owns two pieces of real property in Florida with a combined fair market value of $3.5—3.6 million, subject to mortgages totaling approximately $2.5 million, leaving maximum equity in the properties of $1.4 million.

Mr. Thakkar contends he owns these two properties with his wife as tenants by the entirety. The deeds under which he holds title were not presented to the Court, and no other evidence of title was presented. The parties debated the effect of owning the property as tenants by the entirety on Mr. Thakkar's solvency. Under Florida law, property held by a husband and wife as tenants by the entirety belongs to neither individual spouse, but to a separate entity referred to as the "unity"

51

or "the marriage." In re Bundy, 235 B.R. 110, 112 (Bankr. M.D. Fla. 1999); In re Hinton, 378 B.R.

371, 377 (Bankr. M.D. Fla. 2007)). Thus, "[u]nder Florida law, when property is held as tenancy

by the entirety, it cannot be reached by a creditor to satisfy the individual debt of one spouse." In

re Wincorp, Inc., 185 B.R. 914, 918 (Bankr. S.D. Fla. 1995). Where property held as tenants by

the entirety is exempt from creditor collection, the property is also excluded from solvency

calculations. See e.g., Premier Capital, Inc. v. Hand, 2006 R.I. Super. LEXIS 188, at *19 (Super.

Ct. Dec. 27, 2006); Ming Props., Inc. v. Stardust Marine S.A., 741 So. 2d 554 (Fla. 4th DCA 1999)

(property held in a tenancy by the entirety was not an asset within the meaning of Florida

fraudulent transfer law and did not count for solvency calculations). Plaintiff disputes this

interpretation but, even if the Florida properties are considered property of Mr. Thakkar, the

combined value of the properties is still significantly short of being able to satisfy the large

personal judgment against Mr. Thakkar. This evidence is sufficient to rebut the presumption of

solvency.

Further, Plaintiff did not carry its burden of establishing Mr. Thakkar's solvency. Plaintiff

submitted a Wells Fargo credit report reflecting Wells Fargo's assessment that Mr. Thakkar was

strong financially as of May 1, 2013. The credit report, however, evaluates Mr. and Mrs. Thakkar

together and includes assets held by other entities (for example, NRCT and property that was

owned by Bay Circle when the petition was filed). Plaintiff also submitted a personal financial

statement of Mr. Thakkar provided to Wells Fargo dated December 31, 2013. The financial

statement shows a net worth of over $128 million. However, this financial statement, like the Wells

Fargo assessment, includes his wife and real estate owned by other entities, including the Debtors.

While these two documents provide some evidence of Mr. Thakkar's financial condition in 2013,

they do not prove his current personal financial condition since they are nine years old and include

assets owned by other entities. Moreover, all parties are aware that much of what is included in the statement has since been disposed of in these bankruptcy cases and in other ways.

The Court concludes the evidence presented at trial did not establish Mr. Thakkar's balance sheet solvency. Further, it is not clear that Mr. Thakkar pays his debts as they come due. Mr. Thakkar stated his wife pays their debts, but it is not evident how she affords to do so. Nevertheless, it is clear Mr. Thakkar is not paying the personal judgment against him and that the personal judgment against him is a liability that exceeds his assets. Accordingly, the Court concludes the presumption of solvency has been rebutted as to Mr. Thakkar and Plaintiff has not successfully carried its burden.

### d)     NF

On March 20, 2017, an involuntary Chapter 7 petition was filed against NF in the U.S. Bankruptcy Court for the Middle District of Florida, Case 8:17-bk-03597-MGW. The petition was converted to Chapter 11 on July 26, 2017 and reconverted to Chapter 7 on December 15, 2017. Douglas N. Menchise was appointed as Chapter 7 Trustee. NF is not operating, only liquidating, and, prior to bankruptcy, its only business was as a "lender" to its affiliates. NF filed amended schedules on December 21, 2017 reflecting its only asset was sums due from affiliates of approximately $72,000,000 (which the schedules showed was an uncertain number). Its liabilities consisted of an estimated $61,539,000 owed to affiliates plus approximately $426,000 owed to secured and unsecured creditors.

In addition to the scheduled creditors, Gateway filed a claim for over $13 million, seeking to hold NF liable for Gateway's judgment against Mr. Thakkar on the theory of reverse veil piercing, among other theories. Ultimately, the NF Trustee settled the Gateway claim as well as claims between the estates of NF and OGP. The NF Trustee stipulated that Gateway held an

allowed claim of $9.5 million, but he agreed other parties could object to that claim. Niloy Thakkar filed an objection, which has not yet been adjudicated.

The settlement also provided that Gateway's claim would be subordinated to claims of other creditors. Further, it provided that any recovery by the NF Trustee on NF's claims in the Nilhan Developer's case would be divided equally between Gateway and NF's equity holders.[13]

On June 6, 2022, the NF Trustee filed a Motion to Make a Second Interim Distribution to Creditors. This motion reflects that after making a second distribution, the NF Trustee will hold $277,049.50 in cash and owe approximately $34,571 to creditors, plus his fee. This motion was approved. The NF Trustee estimated that recovery on the NF claim in the Nilhan Developers case ranged from $1.6 million – $2.3 million. Based on this estimate, Gateway and NF equity could each receive between $800,000 – $1.15 million. The NF Trustee does not appear to otherwise be making payment on intercompany debt.

At the trial, Mr. Thakkar testified that NF owed $30-40 million, but he did not state to whom. He agreed generally with the NF Trustee as to the cash available and possible recovery from Nilhan Developers.

The Court finds NF is insolvent on a balance sheet test because the $9.5 million claim of Gateway exceeds NF's assets. The Court does not place any weight on alleged intercompany claims of "$30-40 million" as there is no independent verification of such claims and the schedules filed in NF's case do not support such claims. The schedules, at most, suggest a net claim of less than $10 million, but Mr. Thakkar has testified before this Court that the numbers in the schedules were estimates. No reliable evidence supports Mr. Thakkar's assertion.

---

[13] The exact amount NF will receive in the Nilhan Developers case was contingent on resolution of the Norcross Hospitality claim in that case. The Eleventh Circuit Court of Appeals (Appeal No. 21-13820-E) recently affirmed the Norcross Claim Resolution Order on August 11, 2022.

Gateway argues that NF is solvent because of the payment to equity under the settlement agreement with the NF Trustee. The Court agrees that NF is solvent to the extent payment is available for "equity," but such solvency is limited to the amount payable to equity. The NF Trustee estimates this amount is between $800,000 and $1.15 million. Although the Court expects NF's claim to be paid in full in the Nilhan Developers case since the Norcross Claim Resolution Order was affirmed, the Court chooses $800,000 conservatively as the amount equity would receive, because that is the minimum amount the NF Trustee estimates would be paid to NF equity and this Court is not aware if other factors in the NF case may affect the payment. The Court concludes solvency of NF has been established up to $800,000.[14]

### E.     Calculation of Contribution and Adequate Protection Claim

As discussed above, the Court concludes the appropriate measure of the Contribution Claim against NRCT in this context is the amount paid by the five Debtor guarantors post-petition on the Wells Fargo/Bay Point debt. Mr. Dopp identified post-petition payments made by the Debtors, but he did not add into his total the payments made before August 15, 2015. Moreover, he included the $100,000 Mr. Thakkar contributed to the Nilhan Developers sales price in the total paid by the Debtors. Finally, in reviewing the ledgers, the Court identified a payment by DCT in the amount of $9,825.89 that was not included in Mr. Dopp's analysis. The Court has adjusted the totals paid for these changes and the details are set out in Appendix A, attached hereto.

The Court also reviewed the Wells Fargo ledger of payments received post-petition and the Debtors' ledgers to verify all payments were taken into consideration. The Wells Fargo ledger reflects payments totaling $201,086.78 made in January 2016, as required by the Settlement Agreement. The source of the payments is reflected as unknown by Wells Fargo. At the hearing

---

[14] As shown on Exhibit A, using a higher solvency number does not affect the outcome of this adversary proceeding.

on approval of the Settlement Agreement, counsel for Wells Fargo expressed his understanding the payments would be made by the Debtors. Nevertheless, the Court does not find the payments in the Debtors' ledgers. The parties stipulated that Mr. Dopp's calculation of payments for the period August 15, 2015 to payment in full is correct, but the payments are not reflected as payments by the Debtors or non-Debtors. Finally, Mr. Thakkar testified that all post-petition payments were made by the Debtors. With this conflicting evidence, the Court cannot determine who made the payments (whether it was a Debtor, non-Debtor, or third party), and therefore excludes them from the Court's calculation.

The Court finds the Debtors other than NRCT paid a total of $24,127,863.04 on the Wells Fargo debt post-petition. NRCT paid nothing. As discussed above, the Court determined that only the five Debtors would be considered in the "denominator" in determining the claim. Dividing the total payments by the Debtors post-petition by five, yields a "fair share" amount of $4,825,572.61. Sugarloaf, Nilhan Developers, and Bay Circle all paid more than their fair share, while DCT and NRCT did not. DCT paid $3,181,696.98,[15] so it underpaid its fair share by $1,643,875.63. The Court divides this shortfall by the remaining four Debtors, so each should pay another $410,968.91, increasing their fair share to $5,236,541.52 each.  Sugarloaf, Nilhan Developers, and Bay Circle all overpaid their fair share. Bay Circle overpaid its fair share by **$332,648.74**, and the Court fixes Bay Circle's contribution claim against NRCT in that amount. Appendix A reflects this analysis under Scenario A.

---

[15] The parties stipulated to Mr. Dopp's calculation of payments in the time period he used, including assigning a value of $2,825,000 to the Corners North Property owned by DCT upon foreclosure by Bay Point. NRCT briefly argued a higher value should be assigned to the Corners North Property. But no evidence was presented on the point, the parties agreed to the Dopp Report calculation in the stated time frame, and Mr. Dopp testified this was the value assigned in the Deed Under Power. The Court accepts the value in the Deed Under Power and notes that, if the higher value of DCT's property was used, DCT's shortfall in payment would have been less, and Bay Circle's contribution claim would have been higher.

In Appendix A, the Court has also calculated what the claim would be if Plaintiff or Defendant were successful on appeal on their alternative arguments. Scenario B calculates the claim if all seven guarantors (but not the primary obligors) were included in dividing the amount paid by all Debtors post-petition. Under Scenario C, the Court calculates the claim if the total paid post-petition (including Mr. Thakkar's additional $100,000) was divided evenly among all eleven primary and secondary obligors.

Scenarios D and E consider the effect of including all payments made by any party on the debt evidenced by the Amended and Restated Loan Agreement of April 30, 2013 until the debt was satisfied. The Court used the evidence of payments from the exhibits provided by Wells Fargo and Bay Point as to payments received, together with the records of the Debtors, and the testimony of Mr. Thakkar that the primary obligors made the payments on the debt pre-petition. Scenario D then divided this total payment by eleven as if all were equally liable. Scenario E, excludes the payments made by the primary obligors and divides the balance by seven, yielding the same result as Scenario B.

The Court's judgment takes into account not only the context of the claim (Bankruptcy Court), the purpose of the claim (fixing an adequate protection claim under sections 361 and 363 of the Bankruptcy Code), and the financial condition of the parties at trial, but also the relative equities and obligations of the Primary and Secondary Obligors and Gateway. The primary obligors should have paid 100% of the debt; even counting the pre-petition payments, they did not. They paid $14,202,428.97, while the Debtors paid $24,127,863.04. The primary obligors should not factor into the contribution claim. As to the Debtors, it is only fair that NRCT contribute to the debt payoff. Its property was collateral, just as the other Debtors' property served as collateral, and Wells Fargo held deeds in lieu of its property, just like it did for the other Debtors' property. All

of the other Debtors eventually lost their property. (Even the Sugarloaf property that was not originally sold was subsequently lost to foreclosure). To allow NRCT to avoid any compensation of Bay Circle on those facts is simply not equitable. (This case did not involve any contribution claims of Sugarloaf or Nilhan Developers). At the same time, Gateway held a lien on only the Bay Circle property by virtue of its judgment against Mr. Thakkar. It has no general unsecured claim in the Bay Circle case and no claim in any of the other cases. But to allow Mr. Thakkar to escape liability to Gateway on the lien on the Bay Circle Property seems unfair since the Thakkar family will retain unencumbered millions of dollars of real estate in Metro Atlanta through the family's ownership of NRCT. Balancing all these factors, the Court concludes Bay Circle's claim for contribution against NRCT is $332,648.74.

### F.    Interest

In its post-trial brief, Plaintiff asked for the first time for interest on the contribution claim. A request for interest was not included in the Complaint or the Pre-Trial Order.

Georgia law allows courts to provide relief not requested in a complaint so long as it is not on a default judgment and the party requesting the additional relief requests it, the parties litigate it, and the opposing party has a chance to challenge it. Under Georgia's judgments statute, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings; but the court shall not give the successful party relief, though he may be entitled to it, where the propriety of the relief was not litigated, and the opposing party had no opportunity to assert defenses to such relief." O.C.G.A. § 9-11-54(c)(1); see Empire Banking Co. v. Martin, 133 Ga. App. 115, 119 (1974) ("[A] trial judge may grant relief although it was not specifically prayed for."); see also Logan v. Nunnelly, 128 Ga. App. 43, 46 (1973). Georgia courts may grant relief not originally requested in the complaint

as long as there is a demand prior to the entry of final judgment. See Crisler v. Haugabook, 290 Ga. 863, 864 (2012); see also Holloway v. State Farm Fire & Cas. Co., 245 Ga. App. 319, 320-21 (2000); but see Hackbart v. Hackbart, 272 Ga. 26, 26-27 (2000) (declining to provide monetary relief where it was not requested in the complaint); Bennett v. Blackwell, 157 Ga. App. 617, 617 (1981).

The Court concludes the request for interest is not appropriate here. While the addition of interest on the contribution claim may be allowed under state law, the Court did not award interest on Gateway's adequate protection claim. Further, Gateway is not entitled to interest on its underlying claim, 11 U.S.C. §§ 502(b)(2) & 506(b), so interest on its replacement lien is not warranted. See Orix Credit All. v. Delta Res. (In re Delta Res.), 54 F.3d 722, 730 (11th Cir. 1995) (creditor not entitled to receive periodic payments for accruing post-petition interest as part of adequate protection). It is therefore not necessary to add interest to the contribution claim.

But the Court would not award interest on the claim in any event. Plaintiff did not request interest in the Complaint. It did not request it in the Pre-Trial Order. Interest was not provided for in the confirmed Fourth Amended Chapter 11 Plan in relation to the contribution claim, and the Plan specifically stated, "Except to the extent provided herein, interest shall not accrue on Claims, and no Holder of a Claim shall be entitled to interest accruing on any Claim unless otherwise expressly provided under applicable law or the Plan." (Case No. 15-58444 Doc. No. 131.) When a contribution fund was requested in the NRCT bankruptcy case, the Court repeatedly asked the parties whether the funds would be sufficient to cover the contribution claim in full. The parties stated that, after payment of outstanding expenses the amount of funds available would be sufficient to satisfy the maximum potential liability of the contribution claim capped at a75,000.00. Counsel for Plaintiff (Mr. Townsend) was present at the hearing on February 3, 2022 on the request

for a contribution fund and did not object or request additional funds be held for interest. At a further hearing, on June 2, 2022, the Court again inquired whether the funds in the Court Registry were sufficient "Because once this money is released there's no going back. It doesn't matter whether people incur other fees or not." (Case No. 15-58444 Doc. No. 349.) Plaintiff did not request interest be reserved. Finally, Gateway was slow in prosecuting this claim, taking almost three years to prosecute the adversary proceeding and, therefore, contributing to increases in any interest award. For all these reasons, the Court denies the request for interest.

## V.    Conclusion

**IT IS THEREFORE ORDERED** that Bay Circle has a judgment against NRCT in the amount of $332,648.74. A separate judgment will issue.

**IT IS FURTHER ORDERED** that the Court's Adequate Protection Order, as previously amended, is further amended by this Order and the amount of the adequate protection lien is $332,648.74, less all allowed Chapter 11 and Chapter 7 administrative expenses and costs.

**END OF ORDER**

### Appendix A
Contribution Calculations

**Funds paid by Debtors Post-Petition**:

| | |
|---|---|
| Bay Circle: | $5,569,190.26 |
| DCT: | $3,181,696.98 |
| Nilhan Dev: | $7,383,196.86 |
| Sugarloaf: | $7,993,778.94 |
| NRCT: | 0 |
| Total: | $24,127,863.04 |

**Funds Paid by Non Debtors Post-Petition**:

| | |
|---|---|
| C. Thakkar: | $100,000 |

**Funds Paid Post-Petition from Unknown Sources**:

| | |
|---|---|
| Per Settlement Agreement | $201,086.78 |

**"Fair Share" Based on Post-Petition Payments by Debtors**:

| | |
|---|---|
| A. Divided by 5 Debtors: | $4,825,572.61 |
| B. Divided by 7 Guarantors: | $3,446,837.58 |
| C. Divided by 11 Primary and secondary obligors & including post-petition payment by C. Thakkar: | $2,202,533.00 |

**Pre-Petition Payments by Primary Obligors**:

| | | |
|---|---|---|
| Chuck/Saloni Thakkar | : | $4,884,307.39 |
| Niloy/NF: | | $9,318,121.58 |
| Total: | | $14,202,428.97 |

**Payments by Primary and Secondary Obligors Pre and Post-Petition**:

| | |
|---|---|
| Pre-Petition: | $14,202,428.97 |
| Post-Petition Debtors: | $24,127,863.04 |
| Post-Petition Thakkar: | $   100,000.00 |
| Total: | $38,430,292.01 |

**Fair Share Based on Pre and Post-Petition Payments**:

| | |
|---|---|
| D. Divided by 11: | $3,493,662.91 |
| E. Divided by 7: | $3,446,837.58 |

**Contribution Claim, Scenario A (Post-Petition divided by 5)**:

Under Scenario A, DCT underpaid its fair share by $1,643,875.63. Because DCT is insolvent, this underpayment is divided equally among the remaining four Debtors ($410,968.91 each), increasing their fair share to $5,236,541.52. Nilhan Developers and Sugarloaf overpaid their fair share, and Bay Circle overpaid its "fair share" by **$332,648.74**.

**Contribution Claim, Scenario B (Post-Petition divided by 7):**

Under Scenario B, DCT underpaid its fair share by $265,140.60 and N&R underpaid its fair share by $3,446,837.58. Because DCT and N&R are insolvent, this underpayment is divided equally among the remaining five guarantors ($742,395.64 each), increasing their fair share to $4,189,233.22. Nilhan Developers and Sugarloaf overpaid their fair share; Jax underpaid its fair share but is solvent; and Bay Circle overpaid its fair share by **$1,379,957.04.**

**Contribution Claim, Scenario C (Post-Petition divided by 11):**

Under Scenario C, all Debtors including NRCT paid their initial fair share. None of the other obligors or guarantors paid anything except Mr. Thakkar, who paid $100,000. Mr. Thakkar is insolvent and underpaid his fair share by $2,102,533.00. N&R is also insolvent, and underpaid its fair share by $2,202,533.00. NF is solvent only to the extent of $800,000, so its shortfall is $1,402,533.00.[16] The fair share underpayment by the insolvent obligors and guarantors totals $5,707,599. Because of their insolvency, this underpayment is divided equally among the remaining eight obligors and guarantors (all five Debtors, Mrs. Thakkar, Niloy, and Jax)

---

[16] The Court's decision on Norcross Hospitality's claim was affirmed by the Eleventh Circuit Court of Appeals and should result in NF receiving payment in full on its claim of $2,300,000. If so, the amount of "equity" could be as high as $1,150,000 according to the NF Trustee. If the Court assumed NF was solvent to the extent of $1,150,000, the contribution claim in Scenario C would be $2,872,232.88 (in excess of the maximum claim allowable).

($713,449.88 each), increasing their fair share to $2,915,982.99. DCT still paid its fair share. Bay Circle overpaid its fair share by **$2,653,207.27**.

**Contribution Claim, Scenario D (Pre and Post-Petition divided by 11):**

Scenario D assumes that all primary and secondary obligors are equally liable and that the applicable time period is all payments made under the Amended and Restated Loan Agreement of April 30, 2013. Under this scenario, the following paid their fair share: Niloy, NF, Mr. Thakkar, Mrs. Thakkar, Bay Circle, Nilhan Developers, and Sugarloaf. The following insolvent parties underpaid their share:

DCT underpaid its share by    $311,965.93
N&R underpaid its share by    $3,493,662.91

Jax and NRCT each underpaid their share by $3,493,662.91 and both are solvent. The insolvent parties' shortfall ($3,805,628.84) is divided equally among the remaining nine parties ($422,847.65 each). Their fair share then increases to $3,916,510.56. Niloy, NF, Mr. Thakkar, Mrs. Thakkar, Nilhan Developers, Sugarloaf and Bay Circle all paid more than their fair share. Bay Circle overpaid its fair share by **$1,652,679.70**.

**Contribution Claim, Scenario E (Pre and Post-Petition divided by 7):**

Scenario E assumes that the principal obligors do not share in the determination of contribution liability. Since all prepetition payments were made by the primary obligors, this analysis is the same as Scenario B, where all payments made by guarantors are divided by the seven guarantors.

**Distribution List**

**<u>Distribution List</u>**

John A. Thomson, Jr.
Adams and Reese LLP
3424 Peachtree Road NE, Suite 1600
Atlanta, GA 30326

Edmund S. Whitson, III
Adams and Reese LLP
101 E. Kennedy Blvd., Suite 4000
Tampa, FL 33602

Henry F. Sewell, Jr.
Law Offices of Henry F. Sewell Jr., LLC
Buckhead Centre
2964 Peachtree Road NW Suite 555
Atlanta, GA 30305

Clay Martin Townsend
Morgan & Morgan, PA
20 North Orange Avenue Suite 1500
Orlando, FL 32801

Walter E. Jones
Balch & Bingham LLP
30 Ivan Allen Jr. Boulevard, N.W., Suite 700
Atlanta, Georgia 30308

John Lewis, Jr.
Shook, Hardy & Bacon, LLP
1230 Peachtree Street, Suite 1200
Atlanta, GA 30309